## STATE BOARD OF BARBER EXAMINERS *et al.* v. BLOCKER *et al.*

126

*George M. Napier* and *Lawrence S. Camp, attorneys-general, T. R. Gress* and *W. K. Meadow, assistant attorneys-general,* for plaintiffs in error.

*Jones, Fuller, Russell & Clapp* and *W. A. McClain,* contra.

Hill, J.   Mrs. Ruth Blocker and Mrs. Lola McKee brought an equitable petition against C. A. Morrison, H. W. Kitchens, and P. A. Meyer, as the State Board of Barber Examiners, R. C. Coleman, general secretary of examining boards of Georgia, John Wilson, secretary of State of Georgia, alleging, among other things, that plaintiffs will suffer a loss of time and incur burdensome expenses in their business and will be deprived of the opportunity of complying with their contracts with their employers to perform their services, and the loss to the plaintiffs will be irreparable, unless the defendants are enjoined; and they pray that the defendants be enjoined from enforcing or taking any steps whatsoever to enforce the provisions of the barbers act of 1931 as applied to the plaintiffs, the rules and regulations promulgated by the board of barber examiners of Georgia, and from levying tax executions, or from arresting the plaintiffs or their employees and all others similarly situated, or from prosecuting the plaintiffs or their employees, or from interfering with the operations of plaintiffs and their employees in any manner whatsoever; and that the barbers act of 1931 be declared to be unconstitutional and void, etc.   A general demurrer to the petition was overruled by the court, and the defendants excepted.

The first act passed by the legislature of Georgia regulating the occupation of "barbering" was in 1914 (Ga. L. 1914, p. 75).   The

caption of that act is: "An act to regulate the practice of the occupation of a barber in certain cities within the State of Georgia, and to provide for the registering and licensing of persons to carry on such practice, and to insure the proper sanitary conditions in barber-shops and prevent the spreading of disease in the State of Georgia, to establish a State board of barber examiners to carry out the purposes of this act, to make penal any violation of the terms of this act, and to prescribe punishments therefor; and for other purposes." This court in *Cooper* v. *Rollins,* 152 *Ga.* 588 (supra), declared that act constitutional. Similar attacks are made upon the amendatory act of 1931 as were made on the act of 1914; and the principles there ruled with respect to those attacks are controlling in the instant case. Other attacks on the constitutionality of the act of 1931 are without merit. In the *Cooper* case this court held: "1. This court will not declare an act of the legislature unconstitutional, unless the conflict between the act and the constitution is clear and palpable. 2. What trades or occupations shall be regulated, and the nature and extent of the regulations to be applied, are questions for the legislature to determine, and fall within the proper exercise of the police power of the State; and unless the regulations are so unreasonable and extravagant that the property or personal rights of the citizens are unnecessarily and arbitrarily interfered with, without due process of law, they do not extend beyond the power of the State to pass. 3. The act of the legislature 'regulating the occupation of barbers,' approved August 17, 1914 (Acts 1914, p. 75), as amended by the act of 1920 (Acts 1920, p. 109), is not unconstitutional, (a) because it violates the provision of our State constitution which provides that 'Laws of a general nature shall have uniform operation throughout the State,' or (b) because it violates the equal-protection clauses of the fourteenth amendment of the constitution of the United States and of the constitution of this State." The caption of the act of 1931, amendatory of the act of 1914 (Ga. L. 1931, p. 157), after setting out in full the title of the act of 1914, proceeds to state the various provisions of the act, including the following: "and defining the practice of barbering." The act of 1914 thus defines a barber: "Be it further enacted, that to shave any living person, or trim the beard, or cut or dress the hair of any such person, for hire or pay to the person performing any such services or to any other person, shall

be construed as practicing the occupation of barbering within the meaning of this act." The act of 1931 gives the following definition: "Be it further enacted, that section 2 of said act be and the same is hereby repealed, and the following definition substituted therefor, to wit, 'to shave or trim the beard, cut or dress the hair, to give facial or scalp massaging, facial or scalp treatment with oils or creams and other preparations made for this purpose, either by hand or mechanical appliances, to singe and shampoo the hair, or to dye the hair of any living person, for hire or pay, shall be considered as practicing the profession of a barber within the meaning of this act.'"

In arriving at the meaning of the words of an act we must ascertain, if possible, the legislative intent. This legislative intent by amending the act of 1914 appears to be to remove any doubt, if any existed, as to hairdressing and any other feature of barbering which is a specialized branch of that vocation. What other purpose or intent could the legislature have had than to put beyond question what the language of the act of 1914 meant? In *Central of Georgia Ry. Co.* v. *State,* 104 *Ga.* 831 (31 S. E. 531, 42 L. R. A. 518), this court said: "A legislative body should always be presumed to mean something by the passage of an act. . . It would be difficult to conceive how language could more clearly or forcibly express the real intent of the legislature in this matter than the words used in the title . . of this act. If it means anything, it means a purpose of the legislature to adopt and make of force a code of laws, and hence to breathe into every provision in that code the vitality of a legislative enactment. Any other construction would ascribe to the legislature the folly of declaring, in effect, 'We adopt as law in this code everything which would be law any way without further sanction.' It would be just as reasonable for that body to re-enact verbatim et literatim a statute which it recognized and knew to be already of force." And so we must ascribe to the legislature in passing the act of 1931, amending the act of 1914, some meaning in changing the definition of a barber; and unless we give to the legislature an intention to include persons engaged in work such as the plaintiffs allege that they perform, we "ascribe to the legislature the folly of declaring, in effect, 'We adopt as law . . everything which would be law any way.'" In paragraph 8 of the petition the nature and kind of work performed by the plaintiffs is set out as fol-

lows: "That the plaintiffs are beauticians, beauty culturists, beauty-culture specialists, *hairdressers* [italics ours], and operators of beauty shops, and that a beauty culturist's, beauty-culture specialist's, beautician's, and hair dresser's duties or profession consists of work principally for women and done upon the upper part of the body for cosmetic or beautifying purposes, by the application by the hands or of mechanical or electrical apparatus, with or without cosmetic preparations, tonics, lotions, creams; to massage, cleanse, stimulate, exercise, or otherwise to improve or to beautify the scalp, face, neck, shoulders, arms, bust, or upper part of any person, and to arrange, dress, curl, wave, cleanse, clip, trim, singe, bleach, dye, tint, or color or treat the hair and to remove superfluous hair from the body by electrical process." It will thus be observed that the work done by the plaintiffs is very similar to the addition to the definition of a barber as declared in the act of 1931, and nearly every item in the list set out in paragraph 8 of the petition is included in the act of the legislature of 1931, defining what a barber is, except perhaps "the removal of superfluous hair from the body by electrical process." It seems to us that the new definition given to the word "barber" and "barbering" was to throw around patrons of not only barber-shops proper, but to give the same protection and sanitary measures to customers of beauty shops. It is a matter of common knowledge that hairdressers not only cut hair, but massage the face and scalp, apply creams and lotions, and dye the hair, and use all manner of applications to the face, head, and upper part of the body, both by hand and mechanical appliances, and the danger of infection or injury is as great in the case of beauty-shop operators as of the usual and ordinary barber-shop.

The plaintiffs contend that the title of the act of 1931 contains no reference to the words "beautician, beauty-culture specialist, beauty culturist, or hairdresser." They insist that they are not "barbers," but "beauticians," and that the legislature can not regulate their occupation as beauticians unless the title of the act refers to them. It is true that the title of the act does not in terms contain the words "beautician," etc., as quoted above, and in fact Webster's New International Dictionary does not contain the listing of any of these words. In paragraph 9 of the petition the plaintiffs allege that they are, first, beauticians, second, beauty culturists, third, beauty-culture specialists, fourth, hairdressers, and fifth, op-

erators of beauty-shops; and, as stated above, none of these words appear in Webster's New International Dictionary, except the word "hairdresser," and the definition given of a hairdresser is "one who dresses or cuts hair; a barber." So the words, beautician, etc., as used by the plaintiffs, seem to have been coined by those who follow the same occupation. The definition given by Webster states that a "hairdresser" is a "barber," and the legislature has declared that they will regulate the business of barbers, and they did define "barbers," and in doing so we think that they included the various things which the plaintiffs allege that they do. It would be as reasonable to say that lawyers can not be taxed and required to obtain a license to practice law because they call themselves "advocates" or "counselors" in order to avoid the statute law of the State regulating the practice of law, because they are not included expressly in the statute. If a doctor practice medicine under the name of "healer" or some other coined name, he can not avoid his professional tax by so doing. So the question is not what one calls himself, beautician or otherwise; but the real test is, what are the things that the plaintiffs are engaged in doing; are they doing the same things as barbers, or some of the things which are covered by the act of 1931? If they do, then they are subject to the same law as barbers and must be regulated accordingly. The legislature no doubt thought that a barber infected with a contagious disease, whether male or female, whether in barber-shops or hotels or private residences, would spread disease and contagion, although they operate under the name of beautician or some other name. But that is no reason why they should not be regulated, and why the legislature under the police power which it possesses might not pass legislation for the good of the public in preventing the spread of disease. It has become somewhat the fashion in recent years to give certain high-sounding and impressive names to ordinary vocations; thus the real-estate agent becomes the realtor, the undertaker the mortician, the life-insurance agent gets a degree of "C. L. U." —charter-life underwriter. And so we conclude that it is not the name which brings the plaintiffs within the scope of the legislation enacted, but the nature of the work in which they are engaged. If the proprietors or employees in "beauty-shoppes" do substantially the same things that barbers do, and are liable to spread contagious diseases, there is every reason to believe that it was the intention

of the legislature to include them in the regulations which are enacted to regulate barbers, or any others performing the same duties and following practically the same vocation. Therefore the court erred in overruling the demurrer to the petition, and in granting the injunction. *Judgment reversed. All the Justices concur.*

GILBERT, J., concurring specially. This concurrence is based upon the facts alleged in the petition. These facts must be construed most strongly against the pleader. The petition shows that the petitioners for the harsh remedy of injunction have not been molested in any way, either as to their person or property. The suit is instituted plainly and solely for the purpose of restraining a criminal prosecution, expressly inhibited by the Code of 1910, § 5491, and numerous decisions of this court. See dissenting opinion in *Dasher* v. *Valdosta*, 172 *Ga.* 539, 541 (158 S. E. 34); *Montgomery & Atlanta Motor Freight Lines* v. *Georgia Public Service Commission*, 175 *Ga.* 826 (166 S. E. 200). Petitioners allege that they have been given notice that they should report to the Board of Barber Examiners for physical examination and should make application for certificates of registration and otherwise comply with the statute; and that unless these requisites are complied with, petitioners would be prosecuted for misdemeanor under the barbers act of 1931. They then allege "that the plaintiffs will be detained by the defendants under threat of arrest and prosecution, and that plaintiffs will suffer a loss of time and incur burdensome expenses in their business, and will be deprived of the opportunity of complying with their contracts with their employees to perform their services, and the loss to the plaintiffs will be irreparable, unless the defendants are enjoined as hereinafter prayed; that the threats and acts of defendants aforementioned are predicated upon the enforcement as against the plaintiffs by reason of the barbers act of 1931." Thus it will be seen that no property rights are threatened or in any way affected. Of course it is obvious that if they violate a penal statute, and the statute is valid, they should be prosecuted. It is just as plain that any person who is indicted and prosecuted will be "detained," and that such prosecution will necessarily cause loss of time and the burden of more or less expense. These things, we must assume, were known to the General Assembly as necessary results of a criminal prosecution when they enacted the statute forbidding courts of equity to enjoin criminal prosecutions.