RICHARD F. SCHNEIDER *v.* ARTHUR W. DUER
ET AL.
[No. 52, January Term, 1936.]

*Decided May 18th, 1936.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Abram C. Joseph,* with whom were *Louis Peregoff, Jacob Blum,* and *Daniel C. Joseph,* on the brief, for the appellant.

*Charles T. LeViness, III, Assistant Attorney General,* with whom was *Herbert R. O'Conor, Attorney General,* on the brief, for the appellees.

SHEHAN, J., delivered the opinion of the Court.

Richard F. Schneider, the appellant, filed a suit in

equity in the Circuit Court for Baltimore City, in which the constitutionality of chapter 371 of the Acts of the General Assembly of Maryland of 1935, to regulate the trade of barbering, is brought into question. A demurrer to the amended bill of complaint in this case was sustained, and from an order dismissing the bill this appeal is taken.

J. Bernard Wells, the states' attorney for Baltimore City, and Arthur W. Duer, Robert W. Smith, and Vincent A. Cinquegrani, are defendants and appellees. The state's attorney is made a party defendant because he is empowered and directed to prosecute, in the City of Baltimore, upon the part of the State of Maryland, all cases in which the State may be interested. The other three defendants constitute the "Board of Barber Examiners of the State of Maryland"; appointed in pursuance of power and authority contained in the above Act of Assembly. These appointments are claimed to have been illegal because of the alleged unconstitutionality of said act creating that board. The bill of complaint charges that the Act of 1935, ch. 371, and each and every part thereof, is invalid, illegal, and unconstitutional and in contravention of the Bill of Rights, the Constitution of the State of Maryland and that of the United States, and prays that it may be so decreed, and that the defendants be enjoined from enforcing it.

The question here presented is: In the exercise of the police power, has the public such a general interest in the occupation of barbering that the Legislature may, through reasonable police regulations, exercise supervision of this occupation in order that the health and safety of the public may be preserved and not endangered; and, assuming that such regulatory authority and power does exist, then has it been so exercised that the provisions of the act can be upheld as valid and not an invasion of the constitutional rights and guarantees of those whom it is intended to affect? The legislative policy of this State has heretofore been expressed by the Act of 1904, ch. 226, and on two occasions that act has been before

this court, in the cases of *State v. Tag,* 100 Md. 588, 60 A. 465, 467, and *Criswell v. State,* 126 Md. 103, 94 A. 549. In neither of these cases was the constitutionality of the Act of 1904 attacked, this court expressly saying in the *Tag* case that the constitutionality of the act was conceded (not decided). In both cases the question of classification of certain persons, and, consequently, their right to engage in the trade of barbering, were the only questions submitted for decision. So this court for the first time is called on to pass upon the constitutionality of the questions here involved.

This Act of 1904 was incorporated in the Code and became a part of the health article (article 43, sec. 269 *et seq.*), and as such is repealed and re-enacted with amendments by the Act of 1935, ch. 371. The principal difference in these two acts grows out of an effort by the Legislature to bring into supervision, under more exacting regulations and tests, the barber school and its students and apprentices in barber shops; to enlarge the powers of the "State Board of Barber Examiners of the State of Maryland"; to establish divisions, grades, and tests of those who desire to engage in this trade, beyond or in addition to those already prescribed.

Sections 269 to 272 inclusive of the act provide for the appointment and qualifications of the three members of the board, with salaries per annum of $1,500 each, and, generally, provide the legal machinery for the operations of the board; then follow numerous sections providing educational, physical, and manual qualifications for barbers, students, and apprentices; those who are engaged in the trade, and those who wish to be, are divided into classes, and from the members of each class there are exacted license fees and charges. The act imposes numerous rules, regulations, and requirements on these schools and shops, and upon those engaged therein are imposed fines, forfeitures, and removal from the activities of the trade for stated crimes, and lastly legal procedure, including the right of appeal, is provided.

The act is not so framed or arranged with respect to

its numerous sections as to be referred to in sequence, in relation to the subjects and objects involved.

This in general is an outline of the act whose constitutionality is being attacked, and this is the sole question in this appeal.

The precise question presented for consideration in the above cited cases was whether certain provisions of the Act of 1904 could be sustained, which provided for divisions of barbers into classes, some of whom are subjected to the terms of the act and others exempted. The Act of 1904 provided that those engaged in this occupation at the time of its passage should be wholly exempt. Thus arose the question in controversy. The validity of the entire act as a police regulation affecting the health and security of people was not directly involved. This court sustained the contention that this division did not invalidate that act. Such ruling, however, in some respects carries with it an implied recognition of the constitutionality of the act; otherwise the entire act would have been held invalid, and the provisions under attack, equally with all other provisions, would have been held illegal, but it must be observed that in those two cases there are no clearly defined limits of the legislative authority in dealing with this trade. But in the case of *State v. Tag, supra,* the court went further than an implied recognition of the constitutionality of the Act of 1904. It was there said: "When a statute is inexplicable, contradictory, or altogether absurd it may be declared void, apart from any constitutional objections. *Campbell's Case,* 2 Bland, 209. But this Act of 1904 does not appear to us to be subject to any of these objections. It is conceded [not decided] to be constitutional." ·

In the *Criswell* case the question presented was substantially that in the *Tag* case, with the same result. A better definition of the authority and of the limitations of the Legislature, as it relates to the trade of barbering, is given by this court in the recent case of *Dasch v. Jackson,* 170 Md. 251, 183 A. 534, 540, known as the "Paper Hangers' Case." Therein it is stated that: "Perhaps the

farthest point reached by the tide of regulation of labor and industry is marked by the Barbers' Act, which was before this court in *State v. Tag,* 100 Md. 588, 60 A. 465, 466, and *Criswell v. State,* 126 Md. 103, 94 A. 549, and upheld. While that occupation may have some conceivable relation to the public health, (*State v. Armeno,* 29 R.I. 431, 72 A. 216), there is much force in the statement found in *Timmons v. Morris* (D. C.) 271 Fed. 721, 724, that 'The court is convinced that, in so far as the practice of barbering is concerned, the public welfare and comfort—outside of, and beyond what is included in its health and safety—are so insignificant as not to lend color to any right claimed under the police power of the state.' "

In view of these cases, it must be held that the occupation of barbering is a trade or calling that may be subjected to police regulation, so far as the health and safety of the public is concerned.

The barber trade is one of those occupations that, in the interest of public health and safety, has been recognized in many states as a proper subject or field of police regulation. *Marx v. Maybury,* 284 U. S. 691, 52 S. Ct. 5, 76 L. Ed. 583; *State Board of Barber Examiners v. Blocker,* 176 Ga. 125, 167 S. E. 298; *Banghart v. Walsh,* 339 Ill. 132, 171 N. E. 154; *Clark v. State,* 169 Miss. 369, 152 So. 820; *State v. Lockey,* 198 N. C. 551, 152, S. E. 693; *State v. Conragan,* 54 R. I. 256, 171 A. 326; *Mundell v. Graph,* 62 S. D. 631, 256 N. W. 121; *State v. Nolan,* 161 Tenn. 293, 30 S. W. (2nd) 601; *Gerard v. Smith* (Tex. Civ. App.) 52 S. W. (2nd) 347; *Ransone v. Craft,* 161 Va. 332, 170 S. E. 610; *State v. Briggs,* 45 Or. 366, 77 P. 750, 78 P. 361; *State v. Wester,* 135 Wash. 32, 236 P. 790; *State v. Zeno,* 79 Minn. 80, 81 N. W. 748; *Patton v. Bellingham,* 179 Wash. 566, 38 P. (2nd) 364, 98 *A. L. R.* 1076, 1077, and annotations, pp. 1088 to 1096; *Ex parte Lucas,* 160 Mo. 218, 61 S. W. 218; *Cooper v. Rollins,* 152 Ga. 588, 110 S. E. 726, 20 *A. L. R.* 1111, and annotations; 17 *R. C. L.* 555.

The appellant had long been engaged in the occupation of barbering, and conducted a barber school at the time

he instituted this suit. The record and acts of assembly do not clearly show the nature and functions of these schools, but it may be presumed that they are institutions for the instruction of students who desire to become proficient in their chosen trade, and, like many other persons, having selected a calling of a useful and harmless character, such as carpentering, bricklaying, and painting, requiring some technical knowledge of the trade, engage themselves with men of experience in order that they may be better equipped for their work. Under this act it is sought to establish an elaborate plan of regulation of the barber and his shop, and also to regulate barber schools.

This trade is neither highly technical nor exceptionally difficult, and its nature is understood by persons generally, and many regulations found in this act seem to be unnecessary and unreasonable in safeguarding public health or security. The same and possibly additional reasons may be assigned for the regulation of the barber school as for the barber shop, but only for like purposes and to the same extent. These schools are frequented by the public. The services there performed are similar to those in the barber shops, except that inexperienced men are there employed in barbering and in learning that trade by practical experience. In them the same precautions as to health and sanitation are desirable as in properly regulated barber shops. This act, as it relates to barber schools, goes far beyond these precautions.

Acts creating boards or commissions, with numerous officials and paid employees, complicated legal machinery, and elaborate plans for the supposed purpose of regulating simple trades and callings, well known and understood by the public, the expenses of which come out of the pockets or earnings of those engaged in the trade, should be viewed with care and examined with diligence to ascertain whether such acts and regulatory measures are designed to safeguard the public welfare, or for other purposes not sanctioned by law and beyond the limita-

tions prescribed by the letter of the Constitution and by judicial interpretation.

This court has recently said in *Dasch v. Jackson, supra:* "There must of necessity be somewhere a limit to the right of the state to regulate the common useful and harmless activities of life." It should be remembered and held constantly in mind, in considering this question, that the barber trade is one of those callings and activities just referred to, and the question here presented should be considered and disposed of in the light of that characterization of this trade.

Under this act persons desiring to engage in that occupation are met with requirements entirely out of proportion to the character and purposes of this trade and the safeguards that seem just and fair to the public. They constitute an arbitrary prohibition rather than a reasonable approach to a lawful and chosen work. These restrictive measures strike at the foundation of the trade, in that they wrongfully and illegally interfere with those who wish to engage in it, and, if strictly enforced, few would be able to accept this calling and engage in its activities. This constitutes an unreasonable and illegal exercise of police power.

In speaking of the guarantees afforded by the Fifth and Fourteenth Amendments to the Constitution of the United States, and by article 23 of the Declaration of Rights of the Constitution of Maryland, in *Dasch v. Jackson, supra,* this court, through Judge Offutt, has said, "Property within the meaning of that guarantee, includes the right to engage in those common occupations or callings which involve no threat to the public welfare, to exercise a choice in the selection of an occupation, and to pursue that occupation in one's own way so long as one does not interfere with the rights of the others."

And in that case it is further stated: " 'No man's liberty is safe if the Legislature can deny him the right to engage in a harmless calling.' * * * 'The right to follow any of the common occupations of life is an inalienable right. * * * The right to follow any of the ordinary call-

ings of life is one of the privileges of a citizen of the United States.' "

Justice Bradley, speaking for the United States Supreme Court in *Butchers' Union etc., Co. v. Crescent City etc., Co.*, 111 U. S. 746, 4 S. Ct. 652, 28 L. Ed. 585, laid down these principles. Also see supporting cases cited in *Dasch v. Jackson, supra*. The provisions of this act clearly contravene these principles of the law.

We cannot consider at length and in detail all the objections that may be rightfully urged against the validity of this act. Such would carry this opinion beyond reasonable bounds.

But we will refer specifically to some of the provisions that seem especially objectionable and affect the constitutionality of the entire act.

In order to obtain a license to practice this simple trade, one must have had ten years of educational preparation. He must have been a graduate of the eighth grade and have completed a two-year course in a barber school or a barber shop. If working in a shop, his services must continue for at least eight hours a day. These are manifestly unreasonable requirements to enter a simple occupation.

But, in addition to these educational prerequisites, we find the following provision in the act requiring that the course of instruction shall include the following subjects: "Scientific fundamentals for barbering, hygiene, bacteriology, histology of the hair, skin, nails, muscles and nerves, structure of the head, face and neck, elementary chemistry relating to sterilization and antiseptics, disease of the skin, hair, glands and nails, haircutting, shaving and arranging, dressing, coloring, bleaching and tinting of the hair." Laws 1935, ch. 371, sec. 282 L. Such requirements are obviously far beyond the need of this trade; in fact, even an elementary knowledge of all these studies and sciences is beyond the reach of persons except those with advanced education.

He must be subjected to an examination by a board whose qualifications are not adequately defined and whose

powers are so broad that they may be exercised in an arbitrary fashion in this almost unlimited field of requirements.

It is unreasonable that such standards should be set for this occupation. There is an apparent design, although indefensible and unreasonable, to give to this simple and useful trade the characteristics and standards of a highly technical profession, surrounded with requirements, grades, and divisions such as one might expect to find in those professions where life, liberty, and property are of every day concernment. There is no parallel to be drawn between such callings, and an effort to constitute an artificial equality by police regulations cannot be accepted as a constitutional exercise of legislative power.

It is true that the Legislature may, within recognized bounds, delegate its authority to regulatory agencies and commissions created by it, in order to carry out certain powers, legislative plans and purposes, and repose in such agency a reasonable and just exercise in a guarded discretion of those powers delegated. *Keller v. State,* 122 Md. 677, 90 A. 603; *State v. Loden,* 117 Md. 373, 83 A. 564; *Downs v. Swann,* 111 Md. 53, 73 A. 653; *Tighe v. Osborne,* 150 Md. 452, 133 A. 465; *Singer v. State,* 72 Md. 464, 465, 19 A. 1044; 17 *R. C. L.* 555. In these cases it will be observed that the authority of such boards may not be substituted for the legislative will, but they are created for the purpose of carrying into effect the design and purposes of the act, and an unlimited power in such an unlimited field of regulation cannot be sustained.

There are certain provisions in this act and certain established rules for the construction of such statutes that should not be passed without some consideration. The statute expressly states that: "In the event that any portion of this sub-title is declared unconstitutional by a Court of competent jurisdiction, it shall not affect the validity of the remainder of the sub-title which can be given effect without the invalid portion." Laws 1935, ch. 371, sec. 282-O.

In the case of *Welch v. Coglan,* 126 Md. 1, 94 A. 384,

387, this court stated: "It has been held that a statute may be valid in part and void in part, even when the two parts are contained in the same section, provided that the valid part is independent of and severable from that which is void. *Field v. Malster,* 88 Md. 691, 41 A. 1087; *Steenken v. State,* 88 Md. 708, 42 A. 212." Therefore this provision of the statute is merely declaratory of an established canon of construction recognized by this court. It is equally clear that, where the valid and invalid portions are inseverable, and the void portions of the act underlie or permeate the entire act, then the act must fall.

We are not unmindful of the rule "that it is our duty, if possible, to so construe the law as to effectuate the intention of the Legislature." *State v. Tag, supra.* This rule is carried a step further by Judge Urner, speaking for the court in the Trading Stamp Case (*State v. J. M. Seney Co.*), 134 Md. 437, 448, 107 A. 189, 193, where it is said: "The act of the Legislature which is here called in question is entitled to the benefit of every reasonable presumption in favor of its validity. If there is any rational theory upon which it can be sustained consistently with constitutional limitations, it is the duty of the courts to reach that conclusion. An exertion of the police power by the Legislature should not be held to be void if there are any considerations related to the public welfare by which it can be supported."

The right to engage in useful and productive labor is common to all men, *Dasch v. Jackson,* 170 Md. 251, 183 A. 534, 538, and in a constitutional sense is property, of which one may not be deprived except by due process of law. *Id.* It is subject always but only to the restriction that its exercise may be limited under the police power of the state in aid of the public health, morals, or safety. *Dasch v. Jackson, supra.* See 12 *C. J., Constitutional Law,* secs. 425-442; *Keller v. State,* 122 Md. 677, 684, 90 A. 603; *Singer v. State,* 72 Md. 464, 19 A. 1044; *Ruggles v. State,* 120 Md. 553, 87 A. 1080; *Maryland State Funeral Directors' Assn. v. State Board of Undertakers,* 150 Md. 294, 133 A. 62. It lies within the protection of the

twenty-third article of the Maryland Declaration of Rights and the Fourteenth Amendment of the Federal Constitution.

In *Dent v. West Virginia*, 129 U. S. 114, 122, 9 S. Ct. 231, 233, 32 L. Ed. 623, the court said, in speaking of the right of persons to follow any lawful business, trade or profession: "The interest, or, as it is sometimes termed, the 'estate,' acquired in them [their vocations] —that is, the right to continue their prosecution—is often of great value to the possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken." This being the case, a man's lawful trade or profession cannot be destroyed any more than real or personal property confiscated by legislative enactment, and as a corollary to this principle it is held to be equally true that one may not be arbitrarily prevented or unreasonably hindered in engaging in any lawful business, trade, or occupation.

It is not an easy task to apply these rules and limitations in given cases, especially where there is involved this all-pervading indefinable something called the police power of regulation, ever changing to keep pace with the march of time and invention, and advancing to meet the new order of things, struggling with the complexity of our civilization to preserve and promote public welfare and security. So true is this that this court, in *Welch v. Coglan*, 126 Md. 1, 94 A. 384, 386, says: "While no precise boundaries have even been set as to what may and what may not be properly classed as an exercise of police power, the protection and preservation of the public health has universally been recognized as one of the primary fields for its exercise."

With the rules of construction above set forth, and the powers recognized but undefined, and with limitations set upon these powers, we are compelled to deal. This trade has long been recognized; it is one that may not be destroyed and in which people desiring to engage may not be arbitrarily prevented.

In addition to all these requirements, there are imposed,

upon applicants for admission to this trade, further regulations, payments of money, and charges. To carry out these provisions applicants are divided into five classes, masters of barber schools, master barbers, journeymen, students in barber schools, and apprentices in barber shops. For convenience, and as a demonstration of this situation, let us trace the course of a young man who wishes to accept this calling and enters a barber school or a barber shop for instruction. Having entered the school, no charge may be made for his services or for materials used. He is thus deprived of the opportunity of aiding or supporting himself while obtaining his education. If he becomes an apprentice in a barber shop, he must be employed for two years, and only one apprentice may be employed in such shop for every four barbers. As journeyman he must serve one year before he can, after passing an examination, become a master barber, and a fee of five dollars is imposed upon him, and, if a nonresident, a fee of ten dollars is required for a journeyman's license. This difference in charge is manifestly unreasonable. Thereafter a fee of one dollar each year is charged for a renewal of his license, and two dollars if he delays for more than thirty days in applying for such renewal. It is true that, when lawful regulations are imposed, reasonable charges may be exacted to carry out such regulations, and the means ordinarily adopted to do so is a license fee to enter the trade. These requirements, in addition to those conditions, restrictions, and preventions previously considered, impose upon persons who desire to engage in this simple, harmless, useful, and well-known trade unreasonable burdens.

Such an aggregation of regulations and requirements wrongfully interfere with or prohibit persons from engaging in this long-established occupation. Many of them bear no relation whatsoever to the health feature. They go to the very foundation of the act and are inseverable from it. While it may not be necessary to the decision of this case, it may be profitable to point out some, if not all, of the illegal provisions of the act apply-

ing to persons after they are admitted to the trade. They further exemplify the manner in which this occupation is attempted to be regulated, which we regard as unreasonable and unlawful, and show how uncertain is a man's position in the trade, and how easily he may be deprived of it, if the following regulations are held to be constitutional.

Section 282D, restricting the places in which the barbering trade may be practiced, in connection with the unlimited powers of the commission, seems to be unreasonable and susceptible of an arbitrary abuse of power, but a greater part of the evils in this connection is contained in section 282E. The provision in that section that permits the board to revoke a man's license upon his being convicted of any crime is entirely too general and too broad. It has very little, if any, relation to the health feature, and, in addition to the penalty that the criminal law imposes, that of depriving one of his trade or calling, however insignificant the crime may be, reposes unreasonable powers in the board, that may be arbitrarily exercised and should not be tolerated. A man who has endured his punishment should not thereafter be deprived of his livelihood and thrown back upon society as a possible derelict and charge, unable to obtain employment because of an unreasonable intervention of the state. We hold that unrestricted power of revocation to be illegal. And again a person who has a communicable disease and has given it to another may have his license revoked, and it matters not that it was unintentional or how lacking in severity the contagion may be. A common cold, or even a lesser contagious disease, may be the foundation for depriving a man of his livelihood. Certainly this constitutes a punishment entirely out of proportion to the offense. The failure to comply with certain unimportant provisions of the act should not be so severely dealt with, remembering, as we have repeatedly said, that a man's occupation is his property, and depriving him of it is the taking of that property.

For another reason, this act may be held unconstitu-

tional. Where the parts of the act held to be unreasonable within the constitutional meaning are so extensively controlling that those parts which might be held valid become so inoperative and inexplicable as to deprive the act of its purposes and force, then it must be assumed that the Legislature could not have intended to pass an act that would be useless and unworkable.

The provision in the act that the holding of some portion thereof as unconstitutional shall not affect the validity of the remainder of the act cannot be applied here, because the valid portions of this act cannot be given the effect contemplated or intended when the numerous provisions above referred to are held to be unconstitutional. It cannot be assumed that the Legislature could have intended to pass an act that would be useless and of no effect when emasculated by those portions of the act which we must here hold as being unconstitutional.

In conclusion, it should be finally stated, as has been previously intimated, that we regard the provisions of this act as imposing upon people who desire to enter this trade, and who have a right to do so, under constitutional guarantees, unfair and unreasonable restraints. It seems to be designed to exclude, rather than include, them. We hold this act in its entirety to be unconstitutional, in that it contravenes the Fifth and Fourteenth Amendments to the Constitution of the United States and the twenty-third article of the Declaration of Rights of the State of Maryland.

*Decree reversed, and cause remanded for further proceedings in accordance to this opinion, with costs to the appellant.*