626 A.2d 372

Donald KIRSCH et al.

v.

PRINCE GEORGE'S COUNTY, Maryland.

No. 111, Sept. Term, 1992.

Court of Appeals of Maryland.

June 25, 1993.

Andrew E. Greenwald (Jay P. Holland, Joseph, Greenwald & Laake, P.A., on the brief), Greenbelt, for appellant.

Alvin C. Monshower, Jr., Richard L. Miller, Monshower & Miller, Columbia, for amicus curiae The Maryland Ass'n of Realtors, Inc.

Arthur B. Spitzer of American Civ. Liberties Union of the Nat. Capital Area, Washington, DC and Susan Goering of the American Civ. Liberties Union of Maryland, Baltimore, amicus curiae for the American Civ. Liberties Union of Maryland, The American Civ. Liberties Union of the Nat. Capital Area, The Prince George's County Chapter of the ACLU, The University of Maryland Student Section of the ACLU, The U.S. Student Ass'n, The Nat. Ass'n of Student Personnel Administrators, Inc., The Ass'n of College and University Housing Officers–International, The Nat. Clearinghouse for

Commuter Programs, The Student Government Ass'n of the University of Maryland at College Park, The Graduate Student Government of the University of Maryland at College Park, and The Golden I.D. Student Ass'n.

Crystal R. Dixon, Associate County Atty. (Michael P. Whalen, County Atty., Michael O. Connaughton, Deputy County Atty., Sean D. Wallace, Associate County Atty., all on brief), Upper Marlboro, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

In this case, we are asked whether the Prince George's County "mini-dorm" zoning ordinance codified within Subtitle 27 of the Prince George's County Code (1991), regulating the rental of residential property to three or more students pursuing higher education, deprives such students of equal protection of the law by discriminating against a class of persons in violation of the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights.

## I.

Prince George's County derives its zoning authority from the Regional District Act, Maryland Code (1957, 1986 Repl. Vol.), Art. 28, § 8–101. That section designates the county councils of Montgomery and Prince George's Counties "as the district council for that portion of the regional district lying within each county, respectively." § 8–101(a). The section further provides:

"(b) *Grant of zoning power.*—(1) Each district council, respectively, in accordance with the conditions and procedures specified in this article, may by ordinance adopt and amend the text of the zoning ordinance and may by resolution or ordinance adopt and amend the map or maps accompanying the zoning ordinance text to regulate, in the portion

of the regional district lying within its county, (i) the location, height, bulk, and size of buildings, other structures, and units therein, building lines, minimum frontages, depths and areas of lots, and percentages of lots which may be occupied; (ii) the size of lots, yards, courts, and other open spaces; (iii) the erection of temporary stands and structures; (iv) the density and distribution of population; (v) the location and uses of buildings and structures and units therein for trade, industry, residence, recreation, agriculture, public activities, and other purposes; and (vi) the uses of land, including surface, subsurface, and air rights therein, for building, trade, industry, residence, recreation, agriculture, forestry, or other purposes."

The Prince George's County "mini-dorm" ordinance was introduced in the County Council of Prince George's County, sitting as the District Council, as Zoning Ordinance Bill Number CB–152–1989 on October 31, 1989, was enacted into law on November 28, 1989, and took effect on July 1, 1990. The ordinance's preamble states:

"AN ORDINANCE concerning

Mini–Dormitories

FOR the purpose of defining a mini-dormitory; establishing criteria for regulating this use; allowing it as a permitted use or by Special Exception in certain zones, subject to certain criteria; prohibiting the Board of Appeals from granting certain variances for mini-dormitories; prohibiting the Planning Board from approving departures from the required number of parking spaces for mini-dormitories; and requiring all existing uses to be in conformance with these regulations by July 1, 1991."

These legislative goals were achieved by amending the County's zoning ordinance at §§ 27–107.1, 27–229(b), 27–441(b)(6), 27–515(b)(7), 27–547(b)(7), 27–568 and 27–588(c) and adding §§ 27–249.1, 27–374.1, 27–445.7, 27–532.2, and 27–548.1.2.

The ordinance defines a "mini-dormitory" as:

"An off-campus residence, located in a building that is, or was originally constructed as a one-family, two-family, or three-family dwelling which houses at least three (3), but not more than five (5), individuals, *all or part of whom are unrelated to one another by blood, adoption or marriage and who are registered full-time or part-time students at an institution of higher learning.*"

§ 27–107.1(a) (150.1) (emphasis added). Mini-dormitories are permitted uses in all of the "specific residential zones" in the County, except for R–10A Zone (Multifamily High Density Residential–Efficiency); in all of the "comprehensive design zones" except for the "Employment and Institutional Area"; and in the "mixed use zones," provided the facilities satisfy certain requirements:

"(1) The property shall be maintained in accordance with all applicable provisions of the County Code;

(2) Rooms used for sleeping purposes shall have not less than seventy (70) square feet per resident;

(3) All parking spaces shall be provided on-site [at the ratio of one space for each resident].

(4) Parking spaces provided solely for, and on the same lot with the mini-dormitory may be located behind the other (the front space may be used as access to the rear space);

(5) The number of driveway entrances authorized shall not exceed one (1) driveway entrance per lot or per street on which the subject lot has frontage (i.e., a corner lot), unless such driveway entrances were in existence on November 28, 1989;

(6) The use shall not alter the single-family residential character or appearance of the premises;

(7) The maximum percentage of lot coverage for a mini-dormitory shall be the same as that for the dwelling type that was originally constructed on the lot; and

(8) The maximum percentage of lot coverage may only be increased by the District Council in the form of a variance granted in connection with the approval of a Special Exception."

The ordinance specifically prohibits the Board of Zoning Appeals from granting a variance to the requirements. § 27–229(b)(26). Further, departures from the required number of parking spaces may not be approved by the Planning Board and a reduction in the required number of spaces must have approval of the County Council, sitting as the District Council, "in the form of a variance granted in connection with the approval of a Special Exception." § 27–588(c)(2). A "mini-dormitory" is permitted only after obtaining a Use and Occupancy Permit certifying the residence as an acceptable "mini-dormitory" or by receiving special exception from the District Council. The ordinance further provides that nonconforming structures being used as mini-dorms must be certified and "may only continue subject to the requirements of this Section and to any other applicable requirements of [the code]." § 27–249.1(a). In that section, the ordinance continues:

"(b) The purpose of this Section is to prevent or control detrimental effects upon neighboring properties, such as illegal parking and saturation of available parking by residents of mini-dormitories, litter, and noise.

(c) All certified nonconforming mini-dormitories shall meet the following requirements:

(1) The use shall not alter the single-family residential character or appearance of the premises; and

(2) The property shall be maintained in accordance with all applicable provisions of the County Code."

The ordinance provides additional requirements for specific special exceptions at § 27–374.1:

(a) A mini-dormitory may be permitted, subject to the following:

(1) The application shall be accompanied by a statement which sets forth an acceptable maintenance plan;

(2) The site plan shall include the number, type, and location of exterior trash receptacles;

(3) Rooms used for sleeping purposes shall have not less than seventy (70) square feet per resident;

(4) All required parking spaces shall be provided on-site, except as follows:

(A) The required number of parking spaces may be reduced on-site by one (1) space if on-street parking is allowed in front of the subject lot; or

(B) The required number of parking spaces may be provided off-site if:

(i) The mini-dormitory is located within five hundred (500) feet of an existing parking lot;

(ii) The owner of the mini-dormitory has written permission from the parking lot owner for the residents of the mini-dormitory to use the parking lot; and

(iii) The existing parking lot has sufficient surplus parking spaces available to provide the number of spaces required;

(5) Parking spaces provided solely for, and on the same lot with, the mini-dormitory may be located one behind the other (the front space may be used as access to the rear space);

(6) The number of driveway entrances authorized shall not exceed one (1) driveway entrance per building lot or per street on which the subject lot has frontage (i.e., a corner lot) unless such driveway entrances were in existence on November 28, 1989;

(7) The use shall not alter the single-family residential character or appearance of the premises;

(8) The maximum percentage of lot coverage for a mini-dormitory shall be the same as that for the dwelling type that was originally constructed on the lot; and

(9) The maximum percentage of lot coverage may only be increased by the District Council in the form of a variance granted in connection with the approval of a Special Exception."

On July 3, 1990, Donald P. Kirsch and Martha Kaye Dunn, individual owners of residential property they wish to rent to persons including students, and Stephanie Stockman and Dan-

iel Cones, both students at the University of Maryland residing off campus in housing subject to the ordinance, ("the petitioners"), filed suit in the Circuit Court for Prince George's County, seeking declaratory relief from the ordinance. On motion of the plaintiffs, the circuit court issued an interlocutory injunction on February 14, 1991, enjoining the County from enforcing the ordinance pending final disposition. Cross-motions for summary judgment were filed, and on August 1, 1991, the circuit court granted the County's motion. That judgment was affirmed by Court of Special Appeals. *Kirsch v. Prince George's County*, 92 Md.App. 719, 610 A.2d 343 (1992). We granted the plaintiffs' petition for a writ of certiorari and shall reverse the judgment of the intermediate appellate court.

## II.

### A.

Section I of the Fourteenth Amendment of the United States Constitution provides in part:

"No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

Article 24 of the Declaration of Rights provides:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Although the Maryland Constitution does not contain an express equal protection clause, we have long held that equal protection is implicitly guaranteed by the due process provision found in Article 24 of the Declaration of Rights. *See Murphy v. Edmonds*, 325 Md. 342, 353, 601 A.2d 102, 107 (1992); *Hargrove v. Board of Trustees*, 310 Md. 406, 416, 529 A.2d 1372, 1377 (1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 766 (1988); *United Wire v. State Deposit Ins. Fund*, 307 Md. 148, 157, 512 A.2d 1047, 1052 (1986); *Ennis v.*

*State,* 306 Md. 579, 591, 510 A.2d 573, 579 (1986); *State v. Wyand,* 304 Md. 721, 726, 501 A.2d 43, 46 (1985), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 893 (1986); *Loveday v. State,* 296 Md. 226, 241, 462 A.2d 58, 65 (1983); *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 640, 458 A.2d 758, 768, 780–81 (1983); *Lawrence v. State,* 295 Md. 557, 559–60, 457 A.2d 1127, 1128 (1983); *Attorney General v. Waldron,* 289 Md. 683, 704–05, 426 A.2d 929, 940–41 (1981); *Board of Supervisors of Elections v. Goodsell,* 284 Md. 279, 293 n. 7, 396 A.2d 1033, 1044 n. 7 (1979); *Governor v. Exxon Corp.,* 279 Md. 410, 438 n. 8, 370 A.2d 1102, 1118 n. 8 (1977), *aff'd* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Bruce v. Director, Chesapeake Bay Affairs,* 261 Md. 585, 600, 276 A.2d 200, 208 (1971).

We have generally relied on opinions of the United States Supreme Court for interpretation of:

> "Those portions of the Maryland Constitution and Declaration of Rights [which] afford protection to its citizens against unreasonable or arbitrary discrimination in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution."

*United States Mortgage Company v. Matthews,* 167 Md. 383, 395, 173 A. 903, 909, *rev'd on other grounds,* 293 U.S. 232, 55 S.Ct. 168, 79 L.Ed. 299 (1934). *See also Murphy, supra,* at 354, 601 A.2d at 108; *Hornbeck, supra,* at 640, 458 A.2d at 780–81; *Waldron, supra,* at 704, 426 A.2d at 940–41; *Pitsenberger v. Pitsenberger,* 287 Md. 20, 27, 410 A.2d 1052, 1056 (1980); *Bureau of Mines v. George's Creek Coal & Land Co.,* 272 Md. 143, 156, 321 A.2d 748, 755 (1974); *Allied American Co. v. Comm'r,* 219 Md. 607, 615–16, 150 A.2d 421, 426–27 (1959). Nevertheless, we have recognized that the two provisions are independent of one another, and a violation of one is not necessarily a violation of the other. *See Hornbeck, supra,* at 640, 458 A.2d at 781; *Waldron, supra,* at 704–05, 426 A.2d at 941.

In *Murphy v. Edmonds, supra,* we revisited the standards under which legislative classifications are judged in equal

protection cases. Speaking for the Court, Judge Eldridge wrote:

"In most instances when a governmental classification is attacked on equal protection grounds, the classification is reviewed under the so-called 'rational basis' test. Generally under that test, a court 'will not overturn' the classification 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational.' A statutory classification reviewed under the rational basis standard enjoys a strong presumption of constitutionality and will be invalidated only if the classification is clearly arbitrary.

"Where, however, a statutory classification burdens a 'suspect class' or impinges upon a 'fundamental right,' the classification is subject to strict scrutiny. Such statutes will be upheld under the equal protection guarantees only if it is shown that 'they are suitably tailored to serve a compelling state interest.'

"Finally, there are classifications which have been subjected to a higher degree of scrutiny than the traditional and deferential rational basis test, but which have not been deemed to involve suspect classes or fundamental rights and thus have not been subjected to the strict scrutiny test. Included among these have been classifications based on gender, discrimination against illegitimate children under some circumstances, a classification between children of legal residents and children of illegal aliens with regard to a free public education, and a classification under which certain persons were denied the right to practice for compensation the profession which they were qualified and licensed."

*Id.* at 355–357, 601 A.2d at 108–09 (citations omitted).

In recent years, the Supreme Court has declined to extend heightened scrutiny review to additional legislative classifications. Instead, the Court has on several occasions held that notwithstanding the traditional deference accorded legislative acts certain legislative classifications failed rational basis scru-

tiny because the classification adopted did not further the express purpose of the statute. In *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court invalidated a city ordinance requiring an annual special use permit for particular group homes, including homes occupied by mentally retarded citizens. The Court stated:

"The lesson of *[Massachusetts Board of Retirement v.] Murgia* [427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) ] is that where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end."

*Id.* 473 U.S. at 441–42, 105 S.Ct. at 3255, 87 L.Ed.2d at 321. Nevertheless, Justice White, speaking for the Court, continued:

"Our refusal to recognize the retarded as a quasi-suspect class does not leave them entirely unprotected from invidious discrimination. To withstand equal protection review, legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose. This standard, we believe, affords government the latitude necessary both to pursue policies designed to assist the retarded in realizing their full potential, and to freely and efficiently engage in activities that burden the retarded in what is essentially an incidental manner. The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Furthermore, some objectives— such as 'a bare ... desire to harm a politically unpopular group,'—are not legitimate state interests. Beyond that, the mentally retarded, like others, have and retain their

substantive constitutional rights in addition to the right to be treated equally by the law."

*Id.* at 446–47, 105 S.Ct. at 3257–58, 87 L.Ed.2d at 324 (citations omitted).

Passing on the issue of the zoning ordinance's validity, Justice White opined:

"The constitutional issue is clearly posed. The city does not require a special use permit in a R–3 zone for apartment houses, multiple dwellings, boarding and lodging houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes for convalescents or the aged (other than for the insane or feebleminded or alcoholics or drug addicts), private clubs or fraternal orders, and other specified uses. It does, however, insist on a special permit for the Featherston home, and it does so, as the District Court found, because it would be a facility for the mentally retarded. May the city require the permit for this facility when other care and multiple-dwelling facilities are freely permitted?

"It is true, as already pointed out, that the mentally retarded as a group are indeed different from others not sharing their misfortune, and in this respect they may be different from others who would occupy other facilities that would be permitted in an R–3 zone without a special permit. But this difference is largely irrelevant unless the Featherston home and those who would occupy it would threaten legitimate interests of the city in a way that other permitted uses such as boarding houses and hospitals would not. Because in our view the record does not reveal any rational basis for believing that the Featherston home would pose any special threat to the city's legitimate interests, we affirm the judgment below insofar as it holds the ordinance invalid as applied in this case."

*Id.* at 447–48, 105 S.Ct. at 3258, 87 L.Ed.2d at 325.

In *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985), a qualified Vietnam veteran and his wife who established residency in New Mexico in 1981

applied for a tax exemption in 1983 under a New Mexico statute exempting from the State's property tax $2000 of the assessed value of property of honorably discharged veterans who had served on active duty during the Vietnam War for at least 90 continuous days. The exemption was limited to those veterans who resided in New Mexico before May 8, 1976. The exemption was denied. The couple challenged the statute as denying them equal protection of the law. In applying the rational basis standard to strike down the statute, the Court noted that "if the statutory scheme cannot pass even the minimum rationality test, our inquiry ends." *Id.* at 618, 105 S.Ct. at 2866, 86 L.Ed.2d at 493. The Court went on to hold:

> "Even assuming that the State may legitimately grant benefits on the basis of a coincidence between military service and past residence, the New Mexico statute's distinction between resident veterans is not rationally related to the State's asserted legislative goal. The statute is not written to require any connection between the veteran's prior residence and military service. Indeed, the veteran who resided in New Mexico as an infant long ago would *immediately qualify for the exemption upon settling in the* State at any time in the future regardless of where he resided before, during, or after military service."

*Id.* at 621–22, 105 S.Ct. at 2868, 86 L.Ed.2d at 493.

In *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985), the Court invalidated an automobile registration tax scheme which exempted cars purchased in Vermont where a sales tax had been paid. The scheme also provided a credit against the registration tax for the value of a sales tax paid on a vehicle purchased in another state by persons residing in Vermont at the time of purchase where the foreign state reciprocated in like fashion for Vermont residents. The statute was challenged by persons who bought and registered cars outside of Vermont prior to becoming Vermont residents. In discussing the applicable standard of review, the Court stated that "[a]n exemption such as that challenged here 'will be sustained if the legislature could have reasonably concluded that the challenged classification would

promote a legitimate state purpose.' " *Id.* at 22–3, 105 S.Ct. at 2471, 86 L.Ed.2d at 19 (citation omitted). In voiding the statute, the Court concluded:

"In the present case, residence at the time of purchase is a wholly arbitrary basis on which to distinguish among present Vermont registrants—at least among those who used their cars elsewhere before coming to Vermont. Having registered a car in Vermont they are similarly situated for all relevant purposes. Each is a Vermont resident, using a car in Vermont, with an equal obligation to pay for the maintenance and improvement of Vermont's roads. The purposes of the statute would be identically served, and with an identical burden, by taxing each. The distinction between them bears no relation to the statutory purpose."

*Id.* at 23–24, 105 S.Ct. at 2472, 86 L.Ed.2d at 19–20.

In *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), the Court struck down an Alabama statute that imposed a lower gross premiums tax on domestic insurance companies than charged to out-of-state insurance companies with a provision allowing the foreign firms to lower, but not eliminate, their tax liability by investing in Alabama assets and securities. The foreign insurers challenged the statute on equal protection grounds. The Court explained that:

"In whatever light the State's position is cast, acceptance of its contention that promotion of domestic industry is always a legitimate state purpose under equal protection analysis would eviscerate the Equal Protection Clause in this context. A State's natural inclination frequently would be to prefer domestic business over foreign. If we accept the State's view here, then any discriminatory tax would be valid if the State could show it reasonably was intended to benefit domestic business. A discriminatory tax would stand or fall depending primarily on how a State framed its purpose—as benefitting one group or as harming another. This is a distinction without a difference, and one that we rejected last Term in an analogous context arising under the Commerce Clause. *Bacchus Imports, Ltd. v. Dias,* 468

U.S., [263] at 273 [104 S.Ct. 3049, 3056, 82 L.Ed.2d 200,]. See n. 6, *supra.* We hold that under the circumstances of this case, promotion of domestic business by discriminating against nonresident competitors is not a legitimate state purpose."
470 U.S. at 882, 105 S.Ct. at 1683, 84 L.Ed.2d at 762.

In *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982), appellants, residents of Alaska since 1978, challenged Alaska's dividend distribution scheme for income from the Permanent Fund, a fund into which the State was required to deposit a minimum of 25 percent of its annual mineral income. Under the distribution scheme, each adult resident received one dividend unit for each year of residency subsequent to 1959 when Alaska achieved statehood. A couple who had resided in Alaska for two years challenged the statute on the grounds that the dividend distribution plan violated federal equal protection guarantees by creating "preference given to persons who were residents when Alaska became a State in 1959 over all those who have arrived since then, as well as the distinctions made between all bona fide residents who settled in Alaska at different times during the 1959 to 1980 period." *Id.* at 59, 102 S.Ct. at 2312, 72 L.Ed.2d at 677. In applying rational basis to invalidate the statute, the Court reasoned:

"When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. Generally, a law will survive that scrutiny if the distinction it makes rationally furthers a legitimate state purpose. Some particularly invidious distinctions are subject to more rigorous scrutiny. Appellants claim that the distinctions made by the Alaska law should be subjected to the higher level of scrutiny applied to the durational residency requirements in *Shapiro v. Thompson* [394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) ] and *Memorial Hospital v. Maricopa County* [415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) ]. The State, on the other hand, asserts that the law need only meet the minimum rationality test. In any event, if the

statutory scheme cannot pass even the minimal test by the State, we need not decide whether any enhanced scrutiny is called for."

*Id.* 457 U.S. at 60–1, 102 S.Ct. at 2313–14, 72 L.Ed.2d at 677–78.

The Court concluded that the State's objectives of creating a financial incentive for individuals to establish and maintain residency in Alaska and encouraging prudent management of the Permanent Fund were "not rationally related to the distinctions Alaska seeks to make between newer residents and those who have been in the State since 1959." *Id.* at 61, 102 S.Ct. at 2313, 72 L.Ed.2d at 678. The Court further found no legitimate state purpose in the State's third objective to reward citizens for past contributions, concluding that:

"Alaska's reasoning could open the door to state apportionment of other rights, benefits, and services according to length of residency. It would permit the states to divide citizens into expanding numbers of permanent classes. Such a result would be clearly impermissible."

*Id.* at 64, 102 S.Ct. at 2315, 72 L.Ed.2d at 680.

### B.

 No fundamental right or suspect class has been infringed upon by the "mini-dorm" ordinance's classification of housing on the basis of the occupation of the tenants. The petitioners do not argue otherwise. Therefore, we must apply the rational basis standard. To withstand such equal protection scrutiny, the zoning ordinance in question, classifying rental property on the basis of the occupations pursued by the lessees away from their residence, must be rationally related to a legitimate governmental purpose.

We have applied the rational basis standard when invalidating classifications in statutes regulating the pursuit of occupations where those classifications lacked a rational relation to a legitimate governmental purpose. *Wheeler v. State,* 281 Md. 593, 606, 380 A.2d 1052, 1060 (1977) (criminal statute which prohibited some employees of companies from selling, distrib-

uting, publishing and printing obscene matter while allowing employees of motion picture theaters to do so was arbitrary in that the classification of persons subject to punishment bore no relation to the legislative purpose of prohibiting the distribution of obscene materials); *Maryland State Bd. of Barber Examiners v. Kuhn,* 270 Md. 496, 312 A.2d 216 (1973) (statutory scheme permitting barbers to cut hair of men and women, but restricting cosmetologists to cutting hair of women does not "bear a real and substantial relation to the object sought to be obtained); *Bruce v. Director of Chesapeake Bay Aff., supra* (statutes limiting harvesting of crabs and oysters to county of residence represent an unreasonable legislative classification); *Schneider v. Duer,* 170 Md. 326, 184 A. 914 (1936) (statute regulating barbering license which provided for divisions of barbers into classes, some of whom are subjected to the terms of the act and others exempted, and which provided overly burdensome licensing requirements, created unfair and unreasonable restraints); *Dasch v. Jackson,* 170 Md. 251, 183 A. 534 (1936) (public general law licensing and regulating only paper hangers who worked in Baltimore City but not affecting those who labored in other parts of the state struck down under an equal protection analysis); *Havre de Grace v. Johnson,* 143 Md. 601, 123 A. 65 (1923) (city ordinance prohibiting non-residents from operating taxi business clearly unreasonable).

### III.

■ The stated purpose of the Prince George's County "mini-dorm" ordinance is to "prevent or control detrimental effects upon neighboring properties, such as illegal parking and saturation of available parking by residents of mini-dormitories, litter, and noise." § 27–249.1(b). In order to qualify as a resident of a mini-dormitory one must be a student enrolled full or part time in an institution of higher learning. At argument, the County Attorney conceded that the ordinance was passed to address complaints regarding noise, litter, and parking problems from residents of the College Park area, the site of the principal campus of the

University of Maryland, an internationally recognized university community that is expanding in the number of students and scope of degree offerings on an annual basis. Notwithstanding the county-wide effect of the ordinance, the County failed to identify any other neighborhoods in the County where similar off-campus student housing created noise, litter or parking problems.

The crucial question for this Court is whether the County by adopting the ordinance's classification advances its objective of clearing residential neighborhoods of noise, litter, and parking congestion within the command of the Equal Protection Clause of the Fourteenth Amendment and Article 24 of the Declaration of Rights. We hold that it does not. To differentiate between permissible residential tenant classes by creating more strenuous zoning requirements for some and less for others based solely on the occupation which the tenant pursues away from that residence is that sort of arbitrary classification forbidden under our constitutions.

The County has placed strong reliance on the Supreme Court's holding in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) arguing that as in *Boraas,* "the ordinance affects only unrelated individuals and does not impermissibly infringe upon the associational rights of the students." In *Boraas,* the Court was passing on a local zoning ordinance restricting land use to single family dwellings "excluding lodging houses, boarding houses, fraternity houses, or multiple-family dwelling houses." *Id.* at 2, 94 S.Ct. at 1537, 39 L.Ed.2d at 800. "Family" was defined as:

> "One or more persons related by blood, adoption, or marriage, living and cooking together as a single housekeeping unit, exclusive of household servants. A number of persons but not exceeding two (2) living and cooking together as a single housekeeping unit though not related by blood, adoption, or marriage shall be deemed to constitute a family."

*Id.* at 2, 94 S.Ct. at 1537–38, 39 L.Ed.2d at 800. The Supreme Court upheld the statute challenged by a landlord and six

students from the nearby State University who rented a house in the village. The Court opined:

"It is said, however, that the Belle Terre ordinance reeks with an animosity to unmarried couples who live together. There is no evidence to support it; and the provision of the ordinance bringing within the definition of a 'family' two unmarried people belies the charge.

"The ordinance places no ban on other forms of association, for a 'family' may, so far as the ordinance is concerned, entertain whomever it likes.

"The regimes of boarding houses, fraternity houses, and the like present urban problems. More people occupy a given space; more cars rather continuously pass by; more cars are parked; noise travels with crowds.

"A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one within *Berman v. Parker* [348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27], *supra*. The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people."

*Id.* at 416 U.S. 8–9, 94 S.Ct. at 1541, 39 L.Ed.2d at 803–04.

Unlike the zoning ordinance analyzed in *Boraas*, the Prince George's County "mini-dorm" ordinance does not differentiate based on the nature of the use of the property, such as a fraternity house or a lodging house, but rather on the occupation of the persons who would dwell therein. Therefore, under the ordinance a landlord of a building originally constructed as a one, two or three family dwelling is permitted to rent the same for occupancy by three to five unrelated persons so long as they are not pursuing a higher education without incurring the burdens of complying with the arduous requirements of the ordinance. Such occupancy would equally add motor vehicles to a congested parking situation and pose the threat of increased noise and litter. Such a zoning classifica-

tion of residential property is wholly unrelated to the stated purpose of the ordinance, and its impact upon persons who are registered as full-time or part-time students at an institution of higher learning denies those students equal protection of the laws under the Fourteenth Amendment to the United States Constitution and Article 24 of the Declaration of Rights.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUN-TY FOR THE ENTRY OF A JUDGMENT DECLARING ZONING ORDINANCE BILL NUMBER CB–152–1989 IN-VALID; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.

Dissenting Opinion by CHASANOW, J., in which MURPHY, C.J., and RODOWSKY, J. join.

CHASANOW, dissenting.

I respectfully dissent. The Court seems to be either subtly altering the rational basis test, or paying lip service to that test but refusing to apply it in the instant case. The test as set out in *Murphy v. Edmonds* is:

Generally under [the rational basis] test, a court " 'will not overturn' " the classification " 'unless the varying treatment of different groups or persons is so unrelated to the achieve-ment of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational.' "

325 Md. 342, 355, 601 A.2d 102, 108 (1992) (quoting *Gregory v. Ashcroft,* —— U.S. ——, ——, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410, 430 (1991), in turn quoting, *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171, 176 (1979)). Further,

[a] statutory classification reviewed under the rational basis standard enjoys a strong presumption of constitutionality

and will be invalidated only if the classification is clearly arbitrary. (Citations omitted).

*Id.* at 356, 601 A.2d at 108.

In the instant case, the Court restates the rational basis test with a far different spin. "To withstand such equal protection scrutiny, the zoning ordinance in question ... must be rationally related to a legitimate governmental purpose." 331 Md. 89, 104, 626 A.2d 372, 379 (1993). The strong presumption of constitutionality seems to have been ignored both in the restated rational basis test and in its application in the instant case.

The majority holds:

To differentiate between permissible residential tenant classes by creating more strenuous zoning requirements for some and less for others based solely on the occupation which the tenant pursues away from that residence is that sort of arbitrary classification forbidden under our constitutions.

331 Md. at 106, 626 A.2d at 380. I disagree. The zoning ordinance at issue permits student mini-dormitories in residential zones provided the mini-dorms meet the rather strict requirements of the ordinance. If a student mini-dormitory fails to satisfy the requirements of the ordinance, it is still permissible within a residential zone provided a special exception is obtained. There is no contention that the dormitory regulation is arbitrary or irrational, only that the student/non-student classification is arbitrary and irrational.

It is not arbitrary or irrational for the Prince George's County Council to assume that, generally, residential college students will wish to live as close to their college campus as possible. It is not arbitrary or irrational for that legislative body to further assume college dormitories housing college students will, unless regulated, tend to be most highly concentrated in residential neighborhoods surrounding a college campus, whereas other non-student similar group residences will probably be more uniformly disbursed throughout the county. Because non-student group residences probably will not be as

concentrated in any single geographic area as will student group residences near a college campus, there is a basis for zoning regulations addressing these student mini-dorms. It is not irrational to regulate student mini-dorms by requiring a special exception so as to avoid too high a concentration of unregulated, possibly substandard, student mini-dormitories in residential neighborhoods adjacent to institutions of higher learning.

In *Creative School v. Board*, 242 Md. 552, 572, 219 A.2d 789, 801 (1966), this Court held that a Montgomery County Zoning Ordinance which required a special exception for a private school, with no similar requirement for a public school, did not violate constitutional equal protection guarantees. We stated that "if any state of facts reasonably can be conceived that would sustain the classification, the existence of that state of facts at the time of the enactment of the statute must be assumed." *Id.* at 572, 219 A.2d at 800 (citing *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369, 377 (1911)). Several states of facts reasonably can be conceived that would justify the student/non-student classification. We can conceive that some students of the University of Maryland and Bowie State University might not like to live in the campus dormitories and would prefer to live off campus but close to their universities. We can conceive that as full or part-time students, they may only have limited funds and are therefore more willing to tolerate crowded, inferior living quarters. Real estate speculators, seizing upon this market, may buy small, inexpensive single-family residences close to these institutions of higher learning and rent formerly single-family homes to several students per house. Many of these students have cars which they might park on the street. As only nine-month tenants, the students may not be concerned about maintaining the property. Intolerant neighbors inconvenienced by the shortage of parking spaces and concerned about declining aesthetics of their neighborhoods may put their homes up for sale. Prospective buyers may not be eager to move into a neighborhood with neglected, crowded student group residences, so the specula-

tors may be able to purchase more houses at deflated prices. The speculators, without doing anything more than is minimally necessary to rent the properties, can create more mini-dorms in close proximity to these two Universities. Soon there may be a real danger that many quiet college residential neighborhoods will be saturated with student mini-dorms. These assumed justifications are not irrational or arbitrary.

It is also easy to conceive that there is no such problem with non-students or people with other occupations. These non-students are more likely to be employed full-time than are students, and with more money to spend on housing, they presumably may be less willing to tolerate crowded, inferior living conditions. Also, since they will live in the same residence all year long, rather than only for nine months of the year, the premises are less likely to be neglected. Non-student group residences are more likely to be disbursed throughout the county and not clustered around the two Universities.

These hypotheses are conceivable and should not be dismissed as irrational. This Court may believe that the hypothetical justifications for the zoning ordinance are not probable or not likely to occur, but that is not the issue. The issue is whether these hypothetical justifications for the legislation are irrational—they are not. There has been no showing that the County Council was wrong in believing there was a particular problem with student mini-dorms or assuming that, because of their concentration around college campuses, student group residences could be a significant problem unless regulated.

Petitioners also contend that this zoning regulation is a denial of equal protection because it is underinclusive and, if the county is going to regulate group residences, it should uniformly regulate all group residences. I disagree. Even if the County Council chose to regulate one major aspect of the group residence problem (student group residences), rather than all aspects of the problem (all group residences), that should not invalidate the statute.

In *Williamson v. Lee Optical of Oklahoma,* the Supreme Court discussed why the judiciary must be hesitant to void, on equal protection grounds, underinclusive legislation:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. (Citations omitted).

348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955). The fact that the County Council initially dealt with only one aspect of a problem does not render the legislation invalid.

This Court might not agree with the legislative perception of the mini-dorm problem adjacent to a residential college campus or with the legislative solution, but we should not substitute our judgment for that of a legislative body. Nor should we declare any statute invalid unless the strong presumption of validity is overcome and unless it is clearly demonstrated that the legislative body acted irrationally and arbitrarily. The strong presumption of validity of the zoning ordinance at issue has not been overcome. This zoning regulation of student mini-dorms, that if unregulated, might become a problem in residential neighborhoods surrounding a college campus, has not been proven to be clearly arbitrary and irrational.

The majority opinion calls to mind Justice Hugo Black's statements in *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). Justice Black applauded courts for abandoning the practice of holding "laws unconstitutional when they believe the legislature has acted unwisely...." *Id.* at 730, 83 S.Ct. at 1031, 10 L.Ed.2d at 97. Instead, Justice Black expounded: "We have returned to the original constitu-

tional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Id.* In reaching its holding today, this Court may have taken a step backward.

I would affirm the well-reasoned decision of Judge Larnzell Martin of the Circuit Court for Prince George's County as well as the judgment of the Court of Special Appeals. Both of those courts found a rational basis for creating the special exception zoning classification for mini-dorms.

Chief Judge MURPHY and Judge RODOWSKY have authorized me to state that they join in the views expressed in this dissent.