BLOOMSBURG LANDLORDS
ASSOCIATION, INC.,
Plaintiff,

v.

TOWN OF BLOOMSBURG, and Charles
J. Felker, Code Enforcement
Officer, Defendants.

No. 4: CV–94–0148.

United States District Court,
M.D. Pennsylvania.

Dec. 29, 1995.

Andrew J. Primerano, Kennedy and Lucadamo, Hazleton, PA, for plaintiff.

John A. Mihalik, Bloomsburg, PA, for defendants.

### MEMORANDUM

McCLURE, District Judge.

## BACKGROUND

This action was initiated by a complaint filed by plaintiff Bloomsburg Landlords Association, Inc. (Landlords or the association) against the Town of Bloomsburg (Bloomsburg or the town) and Code Enforcement Officer Charles J. Felker. Landlords is a Pennsylvania non-profit corporation organized pursuant to 15 Pa.Cons.Stat.Ann. § 5101 *et seq.* to promote the commercial interests of its members, who own and lease residential real estate in Bloomsburg, Columbia County, Pennsylvania.

Plaintiff brings this action to protest the enactment of Town Ordinance No. 766,[1] entitled "Regulated Rental Unit Occupancy Ordinance" (the ordinance) on December 14, 1993. Ordinance No. 766 requires any landlord leasing a residential unit to three or more persons who are not "related to one another through blood to the level of second cousins, adoption or marriage" to:

1) Designate a manager who resides within the Bloomsburg local calling area if the owner does not reside within that area;

2) Enter into a written rental agreement which shall include an addendum containing provisions mandated by the town ordinance;

3) Be responsible for regulating the conduct of occupants of all regulated units;[2]

---

1. Ordinance No. 766, the successor to Ordinance No. 760, was passed on June 7, 1993. Enforcement of Ordinance No. 760 was suspended on July 12, 1993, by agreement of the parties. Ordinance No. 760 was later rescinded.

2. Article II, Part A of the ordinance sets forth an owner's duties and provides, in relevant part:

As provided for in this Ordinance, every OWNER shall be responsible for regulating the proper and lawful use and maintenance of every DWELLING which he, she or it owns. As provided for in this Ordinance, every OWNER shall also be responsible for regulating the conduct and activities of the OCCUPANTS of every REGULATED RENTAL UNIT which he, she or it owns in the TOWN, which conduct or activity takes place at such REGULATED RENTAL UNIT or its PREMISES.

In order to achieve these ends, every OWNER of a REGULATED RENTAL UNIT shall regulate the conduct and activity of the OCCUPANTS thereof, both contractually and

4) Upon notification by the code enforcement officer of any violations of the town ordinance by occupants of or visitors to the regulated units, specifically for the commission of "disruptive conduct", to take steps to remedy the same, which may include evicting the offending tenants;

5) Obtain a license entitling the owner to offer said properties for lease and pay a licensing fee of $20.00 per occupant;

6) Provide a list of occupants of the residential units to the town upon request; and

7) Allow the residential units to be inspected periodically by the town code enforcement officer.

(Plaintiff's complaint, exhibit "A")

Plaintiff contends that Ordinance No. 766 violates the state and federal constitutional rights of its members. They assert: 1) the violation of their rights under Article I, Section 10(1)[3] and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution under section 1983, 42 U.S.C. § 1983 (Count I) and 2) the violation of their rights under Article 8, Section 1 of the Pennsylvania Constitution (Count II).

As redress for these alleged violations, plaintiff seeks: 1) a declaration that Ordinance No. 766 is "unconstitutional, null and void;" 2) a permanent injunction barring defendant or its agents or officials from "enforcing or attempting to enforce said Ordinance;" 3) a preliminary injunction barring the enforcement of the ordinance during the pendency of this action; 4) attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and 5) such other and further relief as the court deems proper.

Plaintiff filed a separate motion for a preliminary injunction, asking the court to enjoin enforcement of the ordinance during the pendency of this action. Following a conference on plaintiff's motion, the parties stipulated that defendant would refrain from implementing certain provisions of the ordinance pending a final decision on the merits.

The parties' stipulation eliminated the need for a court ruling on plaintiff's request for a preliminary injunction.

Before the court are cross motions for summary judgment. For the reasons which follow, we do not find that the challenged ordinance violates the federal or state constitutions. Judgment will be granted in favor of the defendants and against the plaintiff on that basis. No permanent injunction will issue.

## DISCUSSION

### Motion for summary judgment

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ...

---

through enforcement, as more fully set forth below.
(Plaintiff's complaint, exhibit "A," Article II, Part A, pp. 6–7. Capital letter emphasis original.)

**3.** Article I, Section 10(1) provides that no state shall make any law "impairing the obligation of contracts."

that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 323 and 325, 106 S.Ct. at 2552 and 2554.

 Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 693–94 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).

### Ordinance No. 766

Ordinance No. 766 imposes liability on the landlord for tenants' conduct violative of the ordinance. Specifically, it provides that complaints of disruptive conduct by student tenants will be relayed to the landlord, whose responsibility it will be to take appropriate remedial action.

Article II, Part A of the ordinance provides that:

 ... [E]very OWNER of a REGULATED RENTAL UNIT shall regulate the conduct and activity of the OCCUPANTS thereof, both contractually and through enforcement, as more fully set forth below.

(Plaintiff's complaint, exhibit "A," Article II, Part B–4.)

Article III, Part F provides, in relevant part:

When POLICE or the CODE ENFORCEMENT OFFICER investigate an alleged incident of DISRUPTIVE CONDUCT, he or she shall complete a DISRUPTIVE CONDUCT REPORT upon a finding that the reported incident did, in his or her judgment, constitute "DISRUPTIVE CONDUCT" as defined herein.... In all cases, the CODE ENFORCEMENT OFFICER shall mail a copy of the DISRUPTIVE CONDUCT REPORT to the OWNER or MANAGER within three

working days of the occurrence of the alleged DISRUPTIVE CONDUCT, whether the PERSON making the investigation on behalf of the TOWN as (sic) the CODE ENFORCEMENT OFFICER or POLICE.

(Plaintiff's complaint, exhibit "A," Article III, Part F, p. 15)

"Disruptive conduct" is defined by the ordinance as:

Any form of conduct, action, incident or behavior perpetrated, caused or permitted, by any OCCUPANT or visitor of a REGULATED DWELLING UNIT that is so loud, untimely (as to hour of the day), offensive, riotous, or that otherwise disturbs other PERSONS of reasonable sensibility in their peaceful enjoyment of their PREMISES such that a report is made to POLICE and/or to the CODE ENFORCEMENT OFFICER complaining of such conduct, action, incident, or behavior. It is not necessary that such conduct, action, incident or behavior constitute a criminal offense, nor that criminal charges be filed against any person in order for a PERSON to have perpetrated, caused, or permitted the commission of DISRUPTIVE CONDUCT, as defined herein. Provided, however, that no DISRUPTIVE CONDUCT shall be deemed to have occurred unless the CODE ENFORCEMENT OFFICER or POLICE shall investigate and make a determination that such did occur, and keep written records, including a DISRUPTIVE CONDUCT REPORT, of such occurrences.

(Record document no. 1, exhibit "A," Article I, Part B–4. Capital letters original.)

Article III of the ordinance sets forth the duties of the occupant, and provides, in relevant part:

C. *Peaceful Enjoyment.*

The OCCUPANT shall conduct himself or herself and require other PERSONS, including, but not limited to, GUESTS on the PREMISES and within his or her REGULATED RENTAL UNIT with his or her consent, to conduct themselves in a manner that will not disturb the peaceful enjoyment of the PREMISES by others,

and that will not disturb the peaceful enjoyment of adjacent or nearby DWELLINGS by the PERSONS occupying same.

. . . .

F. *Disruptive Conduct.*

1. The OCCUPANT shall not engage in, nor tolerate nor permit others on the PREMISES to engage in, DISRUPTIVE CONDUCT, or other violations of the Ordinance.

(Plaintiff's complaint, exhibit "A," Article III, Parts C and F)

Notice of such conduct on the part of tenants triggers an obligation on the part of the building owner to take appropriate remedial steps. The ordinance provides:

1. Within ten days after receipt of written notice from the CODE ENFORCEMENT OFFICER that an OCCUPANT of a REGULATED RENTAL UNIT has violated a provision of this Ordinance, **the OWNER shall take immediate steps to remedy the violation and take steps to assure that there is not a reoccurrence of the violation.**

2. Within twenty days after receipt of a notice of a violation, the OWNER shall file with the CODE ENFORCEMENT OFFICER a report, on a form provided by the TOWN, setting forth what action the OWNER has taken to remedy the violation and what steps he or she has taken to prevent a reoccurrence of the violation. **The report shall also set forth a plan as to steps the OWNER will take in the future if the violation reoccurs.**

3. The CODE ENFORCEMENT OFFICER shall review the report and, if adequate steps have been taken and the plan is adequate to address future violations, shall approve the plan. **The OWNER shall, on his or her initiative, enforce the plan and failure to do so shall be a violation of this Ordinance.**

4. In the event that a second violation occurs within a license year involving the same OCCUPANT or OCCUPANTS, the CODE ENFORCEMENT OFFICER may direct the OWNER to evict the OCCUPANTS who violated this Ordinance and to not permit the OCCUPANT to occupy the

PREMISES during the subsequent licensing period.

J. *Code Violations.*

Upon receiving notice of any code violations from the CODE ENFORCEMENT OFFICER, the OWNER shall promptly take action, or cause the necessary action to be taken, to abate the offending condition and eliminate the violation.

(Plaintiff's complaint, exhibit "A," Article II, Parts I and J, pp. 11–12. Bold emphasis added.)

The ordinance attempts to preserve liability of student tenants and their guests for their individual conduct and states that criminal and civil liability for the same is not assigned or transferred to the landlord.

This section shall not be construed as diminishing or relieving, in any way, the responsibility of OCCUPANTS or their GUESTS for their conduct or activity; nor shall it be construed as an assignment, transfer, or projection over onto any OWNER of any responsibility or liability which OCCUPANTS or their GUESTS may have as a result of their conduct or activity under any private cause of action, civil or criminal enforcement proceeding, or criminal law; nor shall this section be construed so as to require an OWNER TO indemnify or defend OCCUPANTS or their GUESTS when any such action or proceeding is brought against the OCCUPANT based upon the OCCUPANT'S conduct or activity. Nothing herein is intended to impose any additional civil/criminal liability upon OWNERS other than that which is imposed by existing law.

This Ordinance is not intended to, nor shall its effect be, to limit any other enforcement remedies which may be available to the TOWN against an OWNER, OCCUPANT, or GUEST thereof.

(Plaintiff's complaint, exhibit "A," Article II, Part A, p. 7)

In the event that the owner does not take steps satisfactory to the town to abate the nuisance, the license required to continue leasing to students may be suspended or revoked. The ordinance provides:

The CODE ENFORCEMENT OFFICER may initiate disciplinary action against an OWNER that may result in a formal warning, non-renewal, suspension or revocation of the OWNER'S License, for violating any provision of this Ordinance that imposes a duty upon the OWNER and/or for failing to regulate the breach of duties by OCCUPANTS as provided for herein.

(Plaintiff's complaint, exhibit "A", Article V, Part A.)

The range of sanctions which may be imposed against the landlord includes:

1. Formal Warning—Formal written notification of at least one violation of this Ordinance. Upon satisfactory compliance with this Ordinance and any conditions imposed by the CODE ENFORCEMENT OFFICER and/or the TOWN Council, the formal warning shall be removed when the OWNER applies for License renewal at a time set by the CODE ENFORCEMENT OFFICER or by TOWN Council.

2. Non–Renewal—The denial of the privilege to apply for License renewal after expiration of the License term. The TOWN will permit the OWNER to maintain OCCUPANTS in the PREMISES until the end of the license term but will not accept applications for renewal of the License until a time set by the CODE ENFORCEMENT OFFICER or by TOWN Council.

3. Suspension—The immediate loss of the privilege to rent REGULATED RENTAL UNITS for a period of time set by the CODE ENFORCEMENT OFFICER or TOWN Council. The OWNER, after the expiration of the suspension period, may apply for License renewal without the need to show cause why the OWNER'S privilege to apply for a License should be reinstated. Upon suspension, the OWNER shall take immediate steps to evict the OCCUPANTS.

4. Revocation—The immediate loss of the privilege to rent REGULATED RENTAL UNITS for a period of time set by the CODE ENFORCEMENT OFFICER or the TOWN Council and the loss of the privilege to apply for renewal of the License at the expiration of the time period. Upon the loss of the privilege to rent, the OWNER shall take immediate steps to evict the OCCUPANTS.

(Plaintiff's complaint, exhibit "A," Article V, Part B.)

The considerations which factor into the decision to sanction the landlord include:

3. Whether the OWNER has prior violations of this Ordinance and other ordinances of the TOWN or has received notices of violations as provided for in this Ordinance.

4. Whether the OWNER has been subject to disciplinary proceedings under this Ordinance.

5. The effect of disciplinary action on the OCCUPANTS.

6. The action taken by the OWNER to remedy the violation and to prevent future violations, including any written plan submitted by the OWNER.

7. The policies and lease language employed by the OWNER to manage the REGULATED DWELLING UNIT to enable the OWNER to comply with the provisions of this Ordinance.

8. In addition to applying discipline as set forth above, the CODE ENFORCEMENT OFFICER may recommend and TOWN Council may impose upon the existing or subsequent licenses. (sic) reasonable conditions related to fulfilling the purposes of this Ordinance.

(Plaintiff's complaint, exhibit "A," Article V, Part C.)

Any one of the following acts or omissions may subject a landlord to the imposition of sanctions:

1. Failure to abate a violation of TOWN Codes and ordinances that apply to the PREMISES within the time directed by the CODE ENFORCEMENT OFFICER.

. . . .

3. Failure to take steps **to remedy and prevent** violations of this Ordinance by OCCUPANTS of REGULATED RENTAL UNITS as required by Article II, Section I of this Ordinance.

4. Failure to file and implement an approved plan to remedy and prevent violations of this Ordinance by OCCUPANTS of a REGULATED RENTAL UNIT as required by Article II, Section I of this Ordinance.

5. Failure to evict OCCUPANTS after having been directed to do so by the CODE ENFORCEMENT OFFICER of the TOWN as provided for in Article II, Section I of this Ordinance.

6. Three violations of this Ordinance or other ordinances of the TOWN that apply to the PREMISES within a License term. For purposes of this Ordinance, there need be no criminal conviction before a violation can be found to exist. Before a prior violation can be considered under this Section, the OWNER must have received notice in writing of this violation within thirty days after the CODE ENFORCEMENT OFFICER received notice of the violation.

(Plaintiff's complaint, exhibit "A," Article V, Part D. Bold emphasis added.)

The ordinance provides for notice in the event of a license suspension or revocation. The notice is required to advise the owner that he or she is prohibited "from renting, letting, or permitting occupancy of the DWELLING UNIT(S) by more than two UNRELATED individuals subject to said enforcement action, from and during the period said action is in effect." (Plaintiff's complaint, exhibit "A," Article V, Part E.) The term "unrelated" is defined by the ordinance as follows:

Of or pertaining to two (2) or more PERSONS not related to one another through blood to the level of second cousins, adoption or marriage.

Owners whose licenses are suspended or revoked have the right to appeal the decision "by submitting in writing ... within thirty (30) days from the date printed on the notice, a detailed statement of the appeal including the grounds therefor and the reason(s) alleged as to why the determination of the CODE ENFORCEMENT OFFICER is incorrect or should be overturned, and a statement of the relief requested by the appellant." *Id.* Upon receipt of a notice of appeal, the Town Secretary/Administrator is required to schedule a hearing within ten days of the filing date. *Id.* Neighboring residents within a three hundred foot radius of the premises are required to be notified of the owner's appeal. *Id.* The Town Council is required to conduct a hearing in accordance with the Local Agency Law, 2 Pa. Cons.Stat.Ann. §§ 551–555. *Id.*

The consequences of leasing premises without a valid license are spelled out in Article VI, Parts A–C of the ordinance:

It shall be unlawful for any PERSON, as either OWNER OR MANAGER of a REGULATED RENTAL UNIT for which a License is required, to operate without a valid, current License issued by the TOWN authorizing such operation. It shall also be unlawful for any PERSON, either OWNER or MANAGER, to allow the number of OCCUPANTS of a REGULATED RENTAL UNIT to exceed the maximum limit as set forth on the License, or to violate any other provision of this Ordinance. IT SHALL BE UNLAWFUL FOR ANY OCCUPANT TO VIOLATE THIS ORDINANCE.

(Plaintiff's complaint, exhibit "A," Article VI, Part A.)

Any violation of this Ordinance shall constitute a summary offense punishable, upon conviction thereof by a district justice, by a fine not to exceed Six Hundred Dollars ($600.00) plus costs of prosecution or, in default of payment of such fine and costs, by a term of imprisonment not to exceed thirty (30) days. Each day of violation shall constitute a separate and distinct offense.

(Plaintiff's complaint, exhibit "A," Article VI, Part B.)

The ordinance also requires that all rental agreements include an addendum containing provisions specified by the town, and set forth in Appendix A of the ordinance. The ordinance states:

All RENTAL AGREEMENTS for REGULATED DWELLING UNITS shall be in writing and shall be supplemented with the Addendum attached hereto as Appendix A. No oral leases and no oral modifications thereof are permitted....

(Plaintiff's complaint, exhibit "A," Article II, Part E.)

The addendum, which all covered landlords are required to include in their rental agreements contains the following provisions pertaining to tenant covenants and obligations:

4. Tenant shall not engage in any conduct on the leased premises which is declared illegal under the Pennsylvania Crimes Code or Liquor Code, or the Controlled Substance, Drug, Device and Cosmetic Act, nor shall Tenant permit others on the premises to engage in such conduct.

5. Tenant shall use and occupy the leased premises so as not to disturb the peaceful enjoyment of adjacent or nearby premises by others.

. . . .

7. Tenant shall not engage in, nor tolerate nor permit others on the leased premises to engage in, "disruptive conduct" which is defined as.... [See the definition at p. 7, *supra.*]

8. Tenant acknowledges and agrees that this tenancy is subject to the provisions of the Regulated Rental Unit Occupancy Ordinance of the Town of Bloomsburg and that the issuance by any municipal officer of the Town of Bloomsburg of a Certificate of Non-compliance with said Ordinance relating to the leased premises shall constitute a breach of the rental agreement of which this addendum is a part. Upon such breach, Landlord shall have the right and option to pursue any and all of the following remedies:

a. Termination of the rental agreement without prior notice;

b. Bring an action to recover possession of the leased premises without abatement of rents paid, including reasonable attorney's fees and costs;

c. Bring an action to recover the whole balance of the rent and charges due for the unexpired lease term, including reasonable attorney's fees and costs;

d. Bring an action for damages caused by Tenant's breach, including reasonable attorney's fees and costs.

(Plaintiff's complaint, exhibit "A", Addendum to residential rental agreement.)

### Federal review of municipal ordinances

Federal courts sitting in judgment of a local municipality's legislative acts owe the municipality a degree of deference in its determination of local needs and preferences. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 469, 101 S.Ct. 715, 726, 66 L.Ed.2d 659 (1981). Local legislative acts enjoy a "presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana,* 452 U.S. 314, 331–332, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981). "This is a difficult presumption to overcome." *Smith v. Lower Merion Township,* 1992 WL 112247 at * 2 (E.D.Pa. May 11, 1992).

Local zoning ordinances are generally upheld by the federal courts unless they are "clearly arbitrary and unreasonable, having no substantial relationship to the public health, safety, morals or general welfare." *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926), cited with approval in *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

Zoning-type restrictions are presumed valid, and parties challenging their validity bear a heavy burden to establish their unconstitutionality. *Farley v. Zoning Hearing Board of Lower Merion Township,* 636 A.2d 1232, 1236 (Pa.Cmwlth.Ct.1994). "An ordinance is valid if it promotes public health, safety or welfare and its provisions are substantially related to the purpose it is to serve.... [T]he lack of any rational relationship to a legitimate governmental purpose must be obvious ... and it validity is debatable, the provisions must be upheld." *Id.*

### Plaintiff's standing

The obvious, unstated purpose of the ordinance is to control the conduct of university students who reside in off-campus housing in Bloomsburg. Bloomsburg is home to Bloomsburg University, a state-affiliated institution of higher education. It is clear that the ordinance's references to disruptive conduct, boisterous behavior, etc. is an attempt

to control the off-campus escapades of university students.

Ordinance 766 affects and imposes obligations on two groups: landlords who lease to university students and their tenants. Defendants argue that plaintiff lacks standing to contest those provisions of the ordinance imposing liability for "disruptive conduct," since the restrictions which those provisions impose are directed at the tenants, not the landlords. We disagree. The ordinance imposes on the landlord responsibility for curtailing "disruptive conduct" on the part of his tenants if complaints are registered. The landlord is required, among other things, to formulate a plan to control such conduct in the event a complaint is registered against his tenants. He thereby becomes responsible for controlling further "disruptive conduct" on the part of his tenants, upon penalty of fines, loss of his rental license and possible imprisonment if he fails in that task. Since he is made responsible for "disruptive conduct," he clearly has standing to contest the definition of that term as unconstitutionally vague.

"The doctrine of standing is 'an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, (Florida General Contractors)*, 508 U.S. 656, ——, 113 S.Ct. 2297, 2301, 124 L.Ed.2d 586, 595 (1993), quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

[A] party seeking to invoke a federal court's jurisdiction must demonstrate three things: (1) "injury in fact," by which we mean an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," . . . (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury "fairly can be traced to the challenged action of the defendant," and has not resulted "from the independent action of some third party not before the court," . . . and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean the "prospect

of obtaining relief from the injury as a result of a favorable 'ruling' is not "too speculative," . . . These elements are the "irreducible minimum," . . . required by the Constitution.

*Id.* at ——, 113 S.Ct. at 2301–02, 124 L.Ed.2d at 595–96, citing *Lujan*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351; *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976); *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); and *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

Landlords who will be affected by the ordinance plainly have such interests in this instance. Ordinance 766 places on the landlord the burden of bringing his tenants' conduct into conformity with the town's demands. If he fails to do so to the town's satisfaction, he may suffer substantial deprivations and penalties. The ordinance requires issuance of a license to lease the premises as student housing. That license can be revoked or suspended if, in the view of town council, the landlord's efforts to control student behavior have been inadequate and/or unsuccessful. Loss of the license will preclude the landlord from leasing his premises to three or more unrelated persons during the suspension period. Even if he maintains the ability to lease it to fewer than three unrelated persons or as a single-family residence—as would appear from the language of the ordinance, the property has lost some of its income-producing potential during the suspension/revocation period. In addition to the loss of his rental license, a landlord faces fines (of up to $600.00 per violation) plus costs of prosecution and possible jail time if the fines levied are not paid.

The relief sought in this action, i.e. invalidation of the ordinance on constitutional grounds, would avert the possibility of any of the consequences adverse to the interests of the landlords.

All of these consequences potentially applicable to the landlords if Ordinance 766 is enforced confer standing on them to challenge the ordinance. See generally: *Florida*

*General Contractors,* 508 U.S. at ——, 113 S.Ct. at 2304–05, 124 L.Ed.2d at 599; *River Park Tenants Association v. 3600 Venture,* 534 F.Supp. 45, 47 (E.D.Pa.1981); and *Farley,* 636 A.2d at 1237 (Applying Pennsylvania law, the court held: "Appellants clearly confirmed that they had standing to challenge the Ordinance when they testified that they are landowners who rent to students and that they have been cited for renting to students in violation of the Ordinance.").

### Restrictions imposed on student conduct

 We consider first the constitutionality of the restraints imposed on tenant conduct. Tenants of covered premises are barred from engaging in "disruptive conduct," conduct defined by the ordinance as behavior "that is so loud, untimely (as to hour of the day), offensive, [or] riotous" that it disturbs "persons of reasonable sensibility in their peaceful enjoyment of their" properties. (Record document no. 1, exhibit "A," Article I, Part B–4.) Similar restrictions on conduct have been upheld against challenges that they were overly broad or unconstitutionally vague.

### Void for vagueness

The vagueness doctrine does not apply equally to all statutes. Differing levels of scrutiny may apply depending upon the constitutional rights affected. *Chavez v. Housing Authority of City of El Paso,* 973 F.2d 1245, 1249 (5th Cir.1992), citing *Ashton v. Kentucky,* 384 U.S. 195, 200, 86 S.Ct. 1407, 1410, 16 L.Ed.2d 469 (1966) and *Exxon Corp. v. Busbee,* 644 F.2d 1030, 1033 (5th Cir.1981). Civil statutes which do not impact on First Amendment rights survive constitutional scrutiny so long as they are not "so vague and indefinite as really to be no rule at all" or are not "substantially incomprehensible." *Id.,* citing *United States v. Clinical Leasing Service, Inc.,* 925 F.2d 120, 122 n. 2 (5th Cir.1991) and *A.B. Small Co. v. American Sugar Refining Co.,* 267 U.S. 233, 239, 45 S.Ct. 295, 297, 69 L.Ed. 589 (1925) and *Exxon Corp. v. Busbee,* 644 F.2d at 1033.

Laws and ordinances which impose only civil penalties and which do not affect First Amendment rights survive constitutional scrutiny unless they are "impermissibly vague" in all applications. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). "A statute is not vague merely because a fact finder must determine questions of reasonableness." *Earley v. State of Alaska,* 789 P.2d 374, 376 (Alaska Ct.App.1990), citing *Stock v. State,* 526 P.2d 3, 7–13 (Alaska 1974).

Ordinance No. 766 is essentially a civil ordinance. Most, if not all, of the consequences of its enforcement are economic, e.g. imposition of a fine, possible eviction, possible license suspension. None of the restrictions imposed infringes on protected First Amendment rights; hence nothing triggers a heightened level of civil scrutiny.

Ordinance No. 766 is not impermissibly vague in all applications. Similar restrictions have been upheld in many contexts. One example of such a restriction, which is substantially similar in its terms, intent and effect, to Ordinance No. 766, is federal public housing regulations set forth at 24 C.F.R. § 966.1–966.57. These regulations "prescribe the provisions that shall be incorporated in leases by public housing agencies" for covered rental units. 24 C.F.R. § 966.1.

Among the restrictions on tenant conduct which must be incorporated in covered leases, under the foregoing regulations, are requirements that the tenant:

1) "[Use the dwelling unit solely as a private dwelling for the tenant and the tenant's household as identified in the lease, and not to use or permit its use for any other purpose;"

2) "[C]omply with all obligations imposed upon tenants by applicable provisions of building and housing codes materially affecting health and safety;"

3) "[K]eep the dwelling unit and such other areas as may be assigned to the tenant for the tenant's exclusive use in a clean and safe condition;"

4) "[A]ct, and cause household members or guests to act, in a manner which will not disturb other residents' peaceful enjoyment of their accommodations and will be conducive to maintaining the project in a decent, safe and sanitary condition;"

5) "[A]ssure that the tenant, any member of the household, a guest, or another person under the tenant's control, shall not engage in:

> (A) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the PHA's [Public Housing Authority's] ... premises by other residents or employees of the PHA, or
>
> (B) Any drug-related criminal activity on or near such premises.

Any criminal activity in violation of the preceding sentence shall be cause for termination of tenancy, and for eviction from the unit." 24 C.F.R. § 966.4(f)(12).

In *Chavez*, a tenant facing eviction from public housing managed by the El Paso Housing Authority (EPHA) challenged the constitutionality of lease restrictions which tracked and were mandated by federal regulation, 24 C.F.R. § 966.4. EPHA attempted to evict the plaintiff, Elfida Chavez, for violating paragraph 7.M of her lease due to the alleged conduct of her son. Paragraph 7.M imposed on a tenant an obligation to:

> conduct himself/herself and to cause resident's household members and guests to conduct themselves in such manner so as not to disturb the neighbor's peaceful enjoyment of their accommodations or community facilities; to refrain from illegal or other activity which would impair the physical or social environment of the complex; and to act in such a way as to be conducive to maintaining the complex in a decent, safe, and sanitary condition.

*Id.* at 1247–48. The inclusion of paragraph 7.M was mandated by federal housing regulation 24 C.F.R. § 966.4(f)(11), which required that such obligations be imposed on the tenant.

Chavez was threatened with eviction for the violent acts of her twenty-two year old son. Although her son had been removed from plaintiff's list of household residents, EPHA charged that she had permitted him to continue visiting her and to stay in her apartment as a guest. Plaintiff challenged the constitutionality of her threatened eviction on these grounds, arguing that it violated: 1) her First Amendment right to freedom of association; 2) her Fifth and Fourteenth Amendment rights of due process; and 3) her Fourteenth Amendment equal protection rights. Plaintiff also asserted that the lease and regulation upon which it was based were unconstitutionally vague and overly broad.

The Fifth Circuit rejected all of Chavez' constitutional arguments. In rejecting her contention that the lease provisions and the supporting federal regulation were unconstitutionally vague, the court stated:

> The phrase "cause others who are on the premises with his consent" is amenable to a sensible construction. At a minimum, the regulation and the lease put tenants on notice that the EPHA will hold them responsible for their misconduct and the misconduct of family and friends that visit them. This is all that the constitution requires.

*Chavez*, 973 F.2d at 1249.

Applying the same criteria to Ordinance 766, it is clear that it is not unconstitutionally vague under the standard for civil statutes.

▇▇▇ Even if we were to apply the somewhat more exacting standard applicable to criminal or quasi-criminal statutes, the ordinance would survive. To survive a void-for-vagueness challenge, a statute which imposes criminal or quasi-criminal penalties [4] must satisfy two criteria: It must provide actual notice, i.e. it must define prohibited conduct with sufficient clarity to inform ordinary people of reasonable understanding what conduct they may not engage in. Second, it must contain adequate enforcement guidelines, i.e. it must establish precise standards delimiting what is and what is not a violation. Failing that, there is a risk of arbitrary enforcement; the door is opened for a "standardless sweep" by law enforcement officials who are free to pursue their "personal predi-

---

4. Quasi-criminal penalties are imposed under the ordinance only if the town's warnings to correct violations go unheeded or if landlords ignore the license requirement or violate a license suspen- sion. If those things occur, a fine may be imposed. If the fine goes unpaid, jail time may be imposed.

lections." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974); and *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). See also: *Leonardson v. City of East Lansing*, 896 F.2d 190, 196 (6th Cir. 1990). "[I]nherently vague statutory language" which permits "selective law enforcement" operates as a denial of due process. *Smith v. Goguen*, 415 U.S. at 575–76, 94 S.Ct. at 1248.

The ordinance provides actual notice of what constitutes violative conduct. Disruptive conduct is descriptively defined in a manner which makes relatively clear what is impermissible and which adequately guards against the possibility of selective enforcement. Cf. *Coates v. City of Cincinnati*, 402 U.S. 611, 613–14, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) (Court declared unconstitutionally vague a Cincinnati "public nuisance" ordinance making it a criminal offense for "three or more persons to assemble ... on any of the sidewalks, street corners, vacant lots ... and there conduct themselves in a manner annoying to persons passing by or occupants of adjacent buildings," stating that: "Conduct that annoys some people does not annoy others.... [T]he ordinance is vague ... in the sense that no standard of conduct is specified at all.") and *Waters v. McGuriman*, 656 F.Supp. 923, 926 (E.D.Pa. 1987) (loitering ordinance struck down as unconstitutionally vague).

### Overly broad

▮ Plaintiff challenges the ordinance as overly broad. Legislation is overly broad if it includes within its scope lawful activity. "Criminal statutes ... that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398, 410 (1987) (citations omitted). See: *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 742,

84 L.Ed. 1093 (1940) (a law is void on its face if it "does not aim specifically at evils within the allowable area of [governmental] control, but ... sweeps within its ambit other activities that constitute an exercise" of constitutional rights).

Here, the provisions barring and defining disruptive conduct are not overly broad. Similar statutes and ordinances have been upheld against challenges that they violate the federal or Pennsylvania constitutions. See, e.g., *Commonwealth v. Mastrangelo*, 489 Pa. 254, 414 A.2d 54 (1980), *cert. denied*, 449 U.S. 894, 101 S.Ct. 259, 66 L.Ed.2d 124 (Pennsylvania disorderly conduct statute survived a First Amendment challenge with the court concluding that it was neither overbroad nor vague); and *Earley v. State of Alaska*, (Alaska anti-noise statute not overly broad or unconstitutionally vague). Compare: *Moore v. City of Gulf Shores*, 542 So.2d 322, 323 (Ala.Crim.App.1988) (anti-noise ordinance held overly broad because it did not make reference to a specific time frame or other factors) and *Campa v. City of Birmingham*, forthcoming 662 So.2d 917 (Ala.Crim.App.1993) (anti-noise ordinance held overly broad).

### Imposition of liability for student conduct

▮ Ordinance 766 imposes liability[5] on landlords for failing to control the conduct of their lessees. Landlords are responsible for taking steps to bring the conduct of their tenants into line if they are notified that violations are occurring. In this respect, ordinance 766 differs from similar legislation. In most contexts, individuals are legally responsible only for their own conduct or for the conduct of those whom they can control. Parents, for example, may be held responsible for the conduct of their minor children. See, e.g., 24 C.F.R. § 966.4. Under a theory of *respondeat superior*, employers are legally responsible for the conduct of those in their employ who are acting within the scope of their employment. What seemingly sets Ordinance 766 apart from these more tradition-

---

**5.** Violation of the ordinance is punishable by a fine of up to $600.00 per violation (with each day of non-compliance considered a separate violation), plus costs of prosecution, and, upon failure to pay the fine, by imprisonment for a period not to exceed thirty days. (Plaintiff's complaint, exhibit "A," Article VI, Part A.)

al instances is the relationship between the parties involved. Landlords are not responsible at common law for the conduct of their tenants. What we must decide is whether responsibility for the controlling of such conduct can be statutorily imposed.

The mechanism by which the ordinance achieves this result is by mandating the inclusion of certain terms in the lease agreement. All leases for covered premises must include the following:

1) a clause prohibiting on the premises conduct declared illegal under the Pennsylvania Crimes Code, the Pennsylvania Liquor Code, or the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act;

2) a clause barring disruptive conduct as defined by the ordinance and barring use of the premises in a manner which disturbs the "peaceful enjoyment" of others; and

3) a clause conferring on the landlord the right to:

a) terminate the lease without prior notice;

b) bring an action to recover possession; and

c) bring an action to recover the whole balance of the rent and charges due for the unexpired lease term, including reasonable attorney's fees and costs.

(Plaintiff's complaint, exhibit "A", Addendum to residential rental agreement.)

Despite defendants' arguments to the contrary, we are not convinced that the mandated lease provisions are unenforceable as conflicting with state law. Although it is a basic tenet of landlord/tenant law that control of the demised premises passes to the tenant, and that the premises are his or hers to do with as he or she will within the bounds of the lease agreement, restrictions can and are legally imposed on such uses.

Landlords unquestionably may impose conditions on how the demised premises are used by the tenant. While such controls generally take the form of restrictions against keeping pets on the premises or painting or making other permanent alterations without the consent of the landlord and other restrictions intended to preserve the condition of the leased premises, we know of no reason under the law why such controls cannot also take. the form of prohibitions against loud parties, noise at late hours, the violation of state drug and alcohol laws, etc. Pennsylvania law, in fact, permits the prohibition of the use of premises for unlawful acts, such as the sale or distribution of illegal drugs, See: Pa.Stat.Ann., tit. 68, § 250.505–A.

In the *Chavez* decision, discussed above, the Fifth Circuit upheld federal housing regulations which punished a tenant with eviction on the basis of the conduct of her 22–year–old son. The court rejected the tenant's contention that evicting her for the conduct of her son violated her right to due process, stating: "Chavez is not being punished for the actions of her son. She is being evicted for failing to ensure that her guests do not disturb or endanger others in her community." *Id.* at 1249. Compare: *Turner .v. Chicago Housing Authority,* 969 F.2d 461, 463–64 (7th Cir.1992) (Seventh Circuit did not reach the question of the constitutionality of an identical lease provision challenged by a class of tenants whose leases had been terminated because of the conduct of guests and relatives outside the rented premises).

There is little difference between the restrictions Ordinance 766 imposes on the conduct of tenants and those imposed on residents in other contexts. For example, home owners and condominium associations and civic or municipal historical associations frequently impose similar, and ofttimes more stringent, controls on owners' or tenants' use of the premises. Such entities frequently seek to create and preserve a certain environment, by, for example, restricting how tenants or home owners use their property.

Such restrictions have been held enforceable, particularly if set forth in a contract or agreement voluntarily entered into by the owner or tenant. See, e.g., 24 C.F.R. § 966.1 *et seq.* Nor is the Ordinance's requirement that eviction proceedings be started against non-compliant tenants a barrier to its enforcement. The Pennsylvania Landlord and Tenant Act of 1951, Pa.Stat.Ann., tit. 68, §§ 250.101–250.602, prescribes the procedures to be followed to evict a tenant. Noth-

ing in the ordinance would appear to require any landlord to violate those protections. All that the ordinance provides is that in the event of unremedied violations, the landlord will be required to "[b]ring an action to recover possession of the leased premises" and to recover rent and charges due for the unexpired lease term. and other costs incurred by the landlord. (See p. 793 *supra.*)

### Restrictions on student housing

Although the restrictions imposed by Ordinance 766 go to conduct, not land-use, and are not, therefore, zoning restrictions, decisions allowing or striking down zoning restrictions on university student housing offer some guidance on the constitutionality of the motives underlying adoption of Ordinance 766. Such cases establish that local authorities may control the location, placement, and amenities of student housing by zoning restrictions.

■■■ Innumerable decisions have upheld the constitutionality of zoning restrictions on student housing. Municipalities may constitutionally regulate the number of unrelated individuals who may occupy a single family dwelling. See, e.g., *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (Supreme Court upheld the zoning ordinance restricting housing to "families," on the ground that it bore a "rational relationship to a permissible state objective") Cf. *Moore v. East Cleveland,* (Distinguishing *Belle Terre,* the Supreme Court invalidated a municipal ordinance restricting the occupancy of dwelling units to a "single family" which was applied to prohibit occupancy by plaintiff, her son and two grandsons, on the ground that it violated plaintiff's due process rights and cut too deeply into the family relationship.) and *Kirsch v. Prince George's County,* 331 Md. 89, 626 A.2d 372 (1993) (County zoning ordinance held unconstitutional), *cert. denied sub nom., Prince George's County v. Kirsch,* —— U.S. ——, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993).

So long as regulations governing the location, amenities, etc. of student housing are rationally related to a legitimate governmental interest, they survive constitutional scrutiny.

In *Village of Belle Terre v. Boraas,* 416 U.S. at 9, 94 S.Ct. at 1541, the Supreme Court upheld a constitutional challenge to an ordinance which restricted land use to single family dwellings and prohibited occupancy of a dwelling by more than two unrelated persons "as a family." In so ruling, the court stated:

> The regimes of boarding houses, fraternity houses, and the like present urban problems. More people occupy a given space; more cars rather continuously pass by; more cars are parked; noise travels with crowds.
>
> A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one.

*Id.*

Likewise, in *Smith v. Lower Merion Township,* the United States District Court for the Eastern District of Pennsylvania upheld a zoning ordinance restricting the areas where students could rent housing in the Township. The township had compiled data demonstrating "that large concentrations of student-tenants ... change the character of the neighborhood and cause traffic and parking problems, in ways that other smaller groups of tenants with less free time and different social customs do not." Those findings, the district court held, justified a zoning restriction on the location of student rental housing. Although the court found "means and ends of the Township's zoning ordinance ... troubling in certain respects ... it concluded that the ordinance was rationally related to a legitimate government interest." *Id.* at * 3.

### Substantive due process claims

■■■ Plaintiff also challenges the ordinance as a violation of its members' right of substantive due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiff argues that the ordinance discriminates against students, in violation of the equal protection clause, and should, for that reason, be subject to a more demanding standard of review. Not every statutory classification is a viola-

tion of the equal protection clause. Only discrimination based on a limited, well recognized set of suspect classifications triggers heightened scrutiny.

The federal courts have declined in the past to recognize college students as a suspect classification. There has been no showing here that college students generally, or those attending Bloomsburg University in particular, are members of a class toward which society has been, historically or irrationally, prejudiced. Restrictions on activities generally engaged in only by teens or young adults have been upheld in other contexts. See, e.g., *Lutz v. City of York*, 692 F.Supp. 457, 459 (M.D.Pa.1988) (anti-"cruising" ordinance upheld). Compare: *Waters v. Barry*, 711 F.Supp. 1125 (D.D.C.1989) (juvenile curfew struck down as violating Fifth Amendment rights of substantive due process) and *Waters v. McGuriman*, (loitering ordinance declared unconstitutional under the Fourth and Fourteenth Amendments).

Further, we do not find a basis for concluding that the ordinance *per se* violates the fundamental constitutional rights of those whose conduct it seeks to regulate such that heightened scrutiny is appropriate on that ground.

There being no basis for the exercise of heightened scrutiny, we review the ordinance under the rationality standard. *Exxon Corporation v. Eagerton*, 462 U.S. 176, 195, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983). See also: *Smith*, slip op. at *2. Rationality is the most lenient level of scrutiny, and the ordinance must be upheld if facts "reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

To prove its substantive due process claim, plaintiff must, therefore, establish that the ordinance is not rationally related to a legitimate government interest. In this it has not succeeded. As we discussed above, the mechanism by which the ordinance attempts to control tenant conduct is by mandating inclusion of certain restrictions in every lease for a covered premises. There is no legal impediment to the restrictions which the town mandates the landlords impose. By their own further agreement, if tenants violate these restrictions, they face eviction. The leverage which these lease provisions give landlords over the tenants is likely to lead to the result which the town seeks, i.e. less boisterous and disruptive conduct from student tenants. Tenants will be compelled either to bring their conduct into line with the town's restrictions, or to face possible eviction for violating the ordinance and refusing to cooperate with efforts of the landlord to bring their conduct into line. The ordinance is, therefore, rationally related to its intended purpose.

■ Further, intentional deprivations of property do not violate the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is provided by the state. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984). Here, as long as the ordinance affords plaintiffs a meaningful post-deprivation remedy, which it in fact does, no due process violation has occurred. Under the ordinance, landlords whose licenses are suspended or revoked are granted a right of appeal by the ordinance.

### Unconstitutional taking

■ Plaintiff also asserts an inverse condemnation claim based on its contention that Ordinance No. 766 deprives its members of substantial use and benefit of their Bloomsburg rental properties by the restrictions imposed on them.

In *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 194–97, 105 S.Ct. 3108, 3120–122, 87 L.Ed.2d 126 (1985), the United States Supreme Court established two prerequisites for federal review of a claimed taking by state or local land use regulations and decisions: 1) a final determination from the state or municipality as to the extent of allowable development; and 2) an unsuccessful effort to obtain compensation for the taking from the state or an inability to pursue such a remedy on the ground that such relief is unavailable. *Id.*

If a state provides an adequate procedure for seeking compensation, the Supreme Court held in *Williamson*, the property own-

er cannot claim a Fifth Amendment violation until the owner has invoked that procedure and been denied just compensation. The Court stated: "[T]he State's action is not 'complete' in the sense of causing a constitutional injury 'unless or until the State fails to provide an adequate post deprivation remedy for the property loss.'" *Id.* at 195, 105 S.Ct. at 3121, citing *Hudson v. Palmer*, 468 U.S. 517, 532 n. 12, 104 S.Ct. 3194, 3203 n. 12, 82 L.Ed.2d 393 (1984). The Constitution does not require pretaking compensation. The state exhaustion requirement is excused only upon a showing that there is no adequate mechanism for relief under state law.

In *Williamson*, the Supreme Court dismissed as premature a Tennessee property owner's claims that his property had been temporarily taken without compensation by operation of local zoning regulations, holding that such claims were not ripe for federal adjudication. Numerous decisions subsequent to *Williamson* have reached the same result, dismissing as not ripe for federal adjudication claims not first presented to the state courts. See, e.g., *Four Seasons Apartment v. Mayfield Heights*, 775 F.2d 150, 151–52 (6th Cir.1985); *G.M. Engineers and Assoc., Inc. v. West Bloomfield Township*, 922 F.2d 328, 329–30 (6th Cir.1990); *Hammond v. Baldwin*, 866 F.2d 172, 179 (6th Cir.1989); and *Diaz v. City of Riverside*, 895 F.2d 1416 (table), slip op. at 2–3 (9th Cir.1990).

Plaintiff's taking claim is, therefore, before this court prematurely. Even if that were not the case, the claim would nevertheless fail.

In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the United States Supreme Court stated that the Fifth Amendment is violated if a

land-use regulation 'does not substantially advance legitimate state interests *or denies an owner economically viable use of his land.*' ...

... [W]hen the owner of real property has been called upon on to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.

*Lucas*, 505 U.S. at 1016, 112 S.Ct. at 2894 (Emphasis original.), quoting *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). The Supreme Court elaborated on the criteria for determining if a Fifth Amendment taking has occurred, stating:

The 'total taking' inquiry we require today will ordinarily entail ... analysis of, among other things, the degree of harm to public lands and resources, or adjacent private property, posed by the claimant's proposed activities. see, e.g., *Restatement (Second) of Torts)*, §§ 827, 827, the social value of the claimant's activities and their suitability to the locality in question..... [Citation omitted.].... and the relative ease with which the alleged harm can be avoided through measures taken by the claimant and the government (or adjacent private landowners) alike..... [Citation omitted.].... The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition (though changed circumstances or new knowledge may make what was previously permissible no longer so.... [Citation omitted.].... So also does the fact that other landowners, similarly situated, are permitted to continue the use denied to the claimant.

*Lucas*, 505 U.S. at 1030–31, 112 S.Ct. at 2901.

The Third Circuit reiterated the requirement in *Midnight Sessions*, stating:

a taking requiring compensation occurs only when a regulation that "destroyed or adversely affected recognized real property interests" reaches a certain magnitude.... In such a circumstance, diminution in the value of the property is only one factor used to determine whether the degree of interference justifies compensation.... A second element is the extent that the regulation interferes with "reasonable, distinct, investment-backed expectations."

A taking is *not* established simply upon a showing of "the denial of 'the ability to exploit a property interest that [the plaintiffs] heretofore had believed was available.'" ...

*Midnight Sessions v. City of Philadelphia,* 945 F.2d 667, 676 (3rd Cir.1991) (Citations omitted.). See also: *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 130, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978) (denial to use air rights to build office tower leaves other reasonable beneficial uses of site and, therefore, there is insufficient interference with investment-backed expectations); *de Botton v. Marple Township,* 689 F.Supp. 477, 481 (E.D.Pa.1988) (denial of curative amendment to zoning ordinance to construct mobile home park does not deprive owner of all uses of property because ordinance still permits construction of single family homes) and *Kent Island Joint Venture v. Smith,* 452 F.Supp. 455, 460 (D.Md.1978) ("Before a court can conclude that there has been an unconstitutional taking of property, the government regulations must deprive the landowner of all reasonable uses of his land.").

A taking is not established solely upon a showing that plaintiffs have been denied "the ability to exploit a property interest" which they previously believed was available to them. *Keystone Bituminous Coal Association v. Duncan,* 771 F.2d 707, 713 (3d Cir. 1985), *aff'd,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) and *Penn Central,* 438 U.S. at 130, 98 S.Ct. at 2662. Cases in which an unconstitutional taking was found involved far more extensive denial of the use or benefit of the subject property. Compare, e.g., *Diaz,* 895 F.2d 1416 (table), slip op. at 3 (No taking occurred—"The substantial development permitted by the City under the Ordinance precludes a finding of a taking. The regulation substantially advances legitimate state interests and does not deprive the Developers of all or substantially all economically viable uses of their land.")

"Limitation on use that still leaves available economic uses does not constitute a taking." *Diaz,* 895 F.2d 1416 (table), slip op. at 3. See, also: *Moore v. City of Costa Mesa,* 886 F.2d 260, 263 (9th Cir.1989) (major portion of property's value must be destroyed before a regulatory taking occurs. Loss of anticipated gains or future profits is not usually sufficient to constitute a taking), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990) and *Hoehne v. County of*

*San Benito,* 870 F.2d 529, 532–533 ("A government entity is not required to permit a landowner to develop property to the full extent it may desire. Denial of the intensive development desired by a landowner does not preclude less intensive, but still valuable development.")

Under this standard, the task of proving an unconstitutional taking is a difficult one. See, e.g., *Goldblatt v. Hempstead,* 369 U.S. 590, 592–93, 82 S.Ct. 987, 989, 8 L.Ed.2d 130 (1962) (City ordinance banning excavations below the water table which prevented the plaintiff from continuing its 30–year old sand and gravel business was not a taking because it was a valid exercise of the police power and even though the ordinance deprived the property of its most beneficial use, the lot retained value.) and *Rogin v. Bensalem Tp.,* 616 F.2d 680, 692 (3rd Cir.1980) (Amendments to zoning laws, which countermanded prior approval of a developer's building plan for a condominium complex, and reduced the number of units permitted per acre was not a taking because the amendments applied to all landowners within the affected zone and because the value of the affected property was not "reduced drastically.")

Members of the plaintiff association can assert no more than the denial of the most profitable use of their properties. The ordinance imposes no restriction on their ability to lease their premises as a single family dwelling or to fewer than three unrelated persons. The restrictions and obligations imposed by the ordinance come into play only if the premises are leased to three or more unrelated persons. That is far from a showing that "interference is so substantial as to render the property worthless or useless" as required by the Supreme Court. *Kent Island,* at 460. See, e.g., *Diaz,* 895 F.2d 1416 (table), slip op. at 3 (It was undisputed that the developers could subdivide the property into 23 lots and not more—Ninth Circuit held that the "substantial development permitted by the City under the Ordinance precludes a finding of a taking.") and *Koncelik v. Town of East Hampton,* 781 F.Supp. 152, 158 (E.D.N.Y.1991) (Plaintiffs would be unable to show inverse condemnation, since the Planning Board granted condi-

tional approval for their three-lot subdivision and the state court eliminated all the Planning Board's conditions.)

### Pennsylvania constitutional challenge

Plaintiff asserts that the licensing fee provisions of the ordinance violate the Pennsylvania Constitution. Article 8, Section 1 of the Pennsylvania Constitution provides that:

All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.

■■■■■ Defendants argue that the fee imposed by the ordinance is a licensing fee, not a tax, and is, therefore, not governed by Article 8, section 1. We agree. The Pennsylvania Commonwealth Court distinguished the two in *Greenacres Apartments, Inc. v. Bristol Township,* 85 Pa.Cmwlth. 572, 482 A.2d 1356 (1984), stating that a licensing fee "is a charge imposed ... for the privilege of performing" some act and "is intended to defray the expense" incurred by the state or municipality in regulating that act. Taxes, on the other hand, are revenue-generating engines used to collect money for the general use of the collecting state or municipality. The fee imposed here is clearly a licensing fee, not a tax. The ordinance requires payment of a fee by the landlord of $20.00 per occupant.

■■■■■ License fees are invalid only if the amount charged is grossly disproportionate to the costs it is allegedly imposed to defray. *Hill v. Borough of Dormont,* 90 Pa.Cmwlth. 10, 494 A.2d 15 (1985). A fee of $20.00 per tenant is reasonable under the circumstances to defray the record-keeping costs and administrative expenses which will be incurred in connection with enforcing Ordinance 766. See, e.g., *Hill* (licensing fees of $75.00 and $300.00, respectively, for operating an jukebox and a video game, found reasonable) and *Stark v. Commonwealth,* 90 Pa.Cmwlth. 80, 494 A.2d 44 (1985) ($150.00 licensing fee to conduct door-to-door solicitation reasonable).

Bloomsburg has provided financial information on the cost of enforcing current housing regulations and projected expenses, based on past experience, of enforcing and overseeing Ordinance 766. Bloomsburg estimates that it will incur administrative, clerical, inspection, and law enforcement costs associated with the ordinance totalling approximately $45,000.00 per year. (Record document no. 33 at p. 29). When divided by the estimated 1,477 students who reside off-campus in the town each year, the result is a $30.61 per student expenditure. The projected per capita expenditure for enforcing the ordinance is $10.00 less per student than the licensing fee charged. The $20.00 licensing fee plainly bears a reasonable relationship to the expenses realistically expected to be incurred in enforcing the ordinance.

For these reasons, we reject plaintiff's challenge under the Pennsylvania Constitution.

### Summary

Plaintiff, representing the interests of its member landlords who own and lease residential real estate in Bloomsburg, Columbia County, Pennsylvania, has standing to challenge the constitutionality of Ordinance 766. The primary targeted tenants of ordinance 766 are university students attending Bloomsburg University and residing in rental units in the town. The restrictions which Ordinance 766 imposes on student/tenant conduct are neither overly broad nor unconstitutionally vague.

The method of enforcing restrictions on student conduct, i.e. by mandating the inclusion of certain provisions in all covered leases and mandating enforcement participation by the landlord in the event reports of violations are received is not unconstitutional. Nor does the ordinance violate the Pennsylvania constitutional prohibition against non-uniform taxes.